CARTER MOUNTAIN TRANSMISSION CORPORATION, Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee.

Joseph P. Ernst and Mildred V. Ernst d/b
as Chief Washakie TV, Intervenor.

No. 17089.

United States Court of Appeals
District of Columbia Circuit.

Argued March 8, 1963.

Decided May 23, 1963.

As Amended June 26, 1963.

Petition for Rehearing En Banc
Denied June 26, 1963.

Mr. E. Stratford Smith, Washington, D. C., with whom Mr. Robert E. Conn, Washington, D. C., was on the brief, for appellant. Mr. Thomas G. Shack, Jr., Washington, D. C., also entered an appearance for appellant.

Mr. Daniel R. Ohlbaum, Assoc. Gen. Counsel, Federal Communications Commission, with whom Mr. Max D. Paglin, Gen. Counsel, and Mrs. Ruth V. Reel, Counsel, Federal Communications Commission, were on the brief, for appellee.

Mr. Vernon L. Wilkinson, Washington, D. C., with whom Mr. James A. McKenna, Jr., Washington, D. C., was on the brief, for intervenor.

Mr. Robert D. L'Heureux, Washington, D. C., filed a brief on behalf of National Community Television Association, Inc., as *amicus curiae*, urging reversal.

Mr. Robert V. Cahill, Washington, D. C., filed a brief on behalf of National Association of Broadcasters, as *amicus curiae*, urging affirmance.

Before BAZELON, Chief Judge, and WILBUR K. MILLER and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

This is a telecommunications case, in which a challenge is made to the power of the Federal Communications Commission to refuse a grant to a common carrier by radio of facilities to be used by community antenna systems,[1] because of the impact of the proposed grant upon an existing television station.

Carter Mountain Transmission Corporation, appellant here, is a common carrier by radio. It filed an application with the Commission for permission to construct a microwave radio communication system to transmit signals—received from television stations located in several distant cities—to community antenna systems established in the towns of Riverton, Lander, and Thermopolis, Wyoming, by Western Television Corporation. A protest was filed by the licensee of television station KWRB–TV, in Riverton, Wyoming, now an intervenor in this appeal. The Commission caused a hearing to be held, after which the Examiner recommended denial of the protest. The Commission reversed, granted intervenor's protest, and denied appellant's application. This appeal followed.[2]

The Commission concluded that it would not serve the public interest, convenience, and necessity to grant appellant's application. Its reasoning was essentially this: that to permit appellant to bring in outside programs for the community antenna systems on the basis proposed would result in the "demise" of the local television station (intervenor KWRB–TV) and the loss of service to a substantial rural population not served by the community antenna systems, and to many other persons who did not choose (or were unable) to pay the cost of subscribing to the community antenna systems; and that the need for the local outlet outweighed the improved service which appellant's proposed new facilities would bring to those who subscribed to the community antenna systems. The Commission, however, expressly gave appellant leave to refile its application when it could show that the community antenna systems would carry the signal of the local outlet (intervenor) and would not duplicate its programming.

The parties have agreed on six questions for our consideration. We will take them up seriatim, stating the questions as presented to us.

1. Community antenna systems (CATV) "amplify and distribute television signals of good quality to areas where reception is non-existent or difficult. Reception is bolstered in weak signal areas by the installation of a common antenna for the whole area at a favorable location, such as a high hill or a mountain. The antenna picks up a steady signal from a distant television broadcast station, and transmits it by wire to the cable of the community receiving service. Individual television sets of subscribers are connected to the cable, and relay amplifiers are located throughout the system so that each home receives an equally clear signal regardless of location." Clarksburg Publishing Co. v. Federal Communications Commission, 96 U.S.App.D.C. 211, 217 n. 16, 225 F.2d 511, 517 n. 16 (1955). See also Lilly v. United States, 238 F.2d 584, 586 (4th Cir. 1956).

2. Under Section 402(b) (1) of the Communications Act of 1934, as amended, 66 Stat. 718 (1952), 47 U.S.C. § 402(b) (1) (1958).

"1. Whether the Commission's denial of Appellant's application is based upon an erroneous application of principles of radio broadcast law to a case of common carrier licensing."

Appellant's argument on this point is in essence that the Commission was required to apply classic common carrier criteria in considering its application, and that under these criteria the Commission would have been obliged to grant a certificate of convenience and necessity authorizing construction of the requested common carrier facilities. The statement is made that under the Communications Act common carriers are regulated "in analogy to the regulation of rail and other carriers by the Interstate Commerce Commission," [3] and a number of decisions of the Interstate Commerce Commission are cited for the proposition that the latter Commission will not deny a permit for construction and operation of common carrier facilities in the field of transportation because of economic impact upon the competitors of the carrier's proposed customer.[4]

■ We do not think the Communications Commission applied incorrect legal principles in reaching its decision, or that it was required to adopt the rationale of the cited decisions of the Interstate Commerce Commission. Those decisions are of little relevance here. Questions of competitive injury in the transportation field are very different from questions of public injury in the field of communications.[5] Here the Federal Communications Commission is charged with the duty of regulating not only common carriers by radio but broadcasters of television programs. It can-

not let its decisions in the radio carrier field interfere with its responsibilities in the television broadcasting field. In both fields, it must "make available, so far as possible, to all the people of the United States," adequate and efficient service. See Section 1 of the Communications Act of 1934, as amended, 47 U.S. C. § 151 (1958). A common carrier by radio cannot construct a new facility or extend its existing facilities *sua sponte*: it must first obtain a certificate or license from the Commission, authorizing it to establish such facilities, and before awarding the authority the Commission must be convinced that the proposal is "reasonably required in the interest of public convenience and necessity." See 47 U.S.C. § 214(a), (c) and (d) (1958). The interest of the listening and viewing public in better and more effective service is paramount. See National Broadcasting Co. v. United States, 319 U.S. 190, 216–217, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); Federal Radio Commission v. Nelson Brothers Bond & Mortgage Co., 289 U.S. 266, 285, 53 S.Ct. 627, 77 L.Ed. 1166 (1933). And in the common carrier field, as well as in the broadcasting field, "competition is a relevant factor in weighing the public interest." Federal Communications Commission v. RCA Communications, Inc., 346 U.S. 86, 94, 73 S.Ct. 998, 1004, 97 L.Ed. 1470 (1953); cf. Mansfield Journal Co. v. Federal Communications Commission, 86 U.S.App.D. C. 102, 180 F.2d 28 (1950).

■■ Relevant, too, is the congressional mandate that the Commission "make such distribution of licenses, frequencies, * * * and of power among the several States and communities as to provide a fair, efficient, and equitable dis-

---

3. Federal Communications Commission v. Sanders Bros. Radio Station, 309 U.S. 470 at 474, 60 S.Ct. 693 at 697, 84 L. Ed. 869 (1940); cf. Mackay Radio & Tel. Co. v. Federal Communications Commission, 68 App.D.C. 336 at 338, 97 F.2d 641 at 643 (1938).

4. Ozark and P. V. R. Co. Construction, 166 I.C.C. 441 (1930); Seaboard A. L. Ry. Co. Receivers Resumption of Operation, 236 I.C.C. 109 (1939); Kansas

City, M. & O. Ry. Co. of Texas Construction, 295 I.C.C. 51 (1955).

5. We note that, even so, the Interstate Commerce Commission is obliged to give weight to "considerations of national policy with respect to the transportation system." Interstate Commerce Commission v. Railway Labor Executives Association, 315 U.S. 373, 377, 62 S.Ct. 717, 720, 86 L.Ed. 904 (1942).

tribution of * * * service to each of the same." Section 307(b) of the Communications Act, 47 U.S.C. § 307(b) (1958). It is axiomatic that in carrying out its obligations under Section 307(b), as in considering the comparative qualifications of applicants for the same frequency or channel, the Commission may weigh the net effect on the community or communities to be served. See Pinellas Broadcasting Co. v. Federal Communications Commission, 97 U.S.App.D.C. 236, 230 F.2d 204, cert. denied, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956); cf. Federal Communications Commission v. Allentown Broadcasting Co., 349 U.S. 358, 75 S.Ct. 855, 99 L.Ed. 1147 (1955). It necessarily follows that in determining whether the authorization requested by appellant would be in the public interest the Commission was entitled—if indeed it was not obliged—to consider the use to which the facilities and frequencies requested were to be put, and to weigh that use as against other legally relevant factors, including the effect on existing local stations. Cf. Federal Power Commission v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961).[6]

■ "2. Whether the Commission's denial is an arbitrary and capricious denial of access to common carrier communications facilities to which Appellant's proposed customer is entitled as a matter of law."

This question must be answered in the negative. There is no basis for the view that appellant's proposed customer is entitled to access to appellant's proposed facilities as a matter of law. Congress has made its "right" to access depend on whether the appellant obtains a license from the Federal Communications Commission under the standard of public convenience and necessity. The Commission's action in this case is not in our opinion arbitrary and capricious, for the reasons set out above, and for additional reasons to be stated later.

■ "3. Whether the Commission's denial for the reasons indicated constitutes an extension of its authority beyond its statutory jurisdiction to regulate community antenna systems."

Appellant points out that the Commission has no direct jurisdiction or authority over community antenna systems, and in fact has asked Congress—so far unsuccessfully—for such authority. It argues that the Commission has nevertheless attempted to regulate Western, the community antenna proprietor, without legal authority, when it included in the order denying appellant's application the words "without prejudice to refiling when a showing can be made that the duplication of programming is adequately avoided and a satisfactory arrangement is arrived at by which the cable system will carry the local KWRB–TV service."

We cannot agree that this amounts to an attempt to regulate Western's antenna system, even though it may have an indirect effect on that system. The Commission was considering appellant's application in its relevant setting, and the clause quoted moderated its denial of that application by granting appellant the opportunity to show that the threatened damage to the local station would not in fact occur, i. e., that Western will not duplicate the latter's programs and will transmit the latter's signal to Western's subscribers. To be sure, appellant would have to secure the cooperation of Western to make such a showing, but in the circumstances this does not appear to us an

---

6. In the Transcontinental case, the Federal Power Commission denied an application for the transportation of natural gas because the proposed end use—burning the gas under industrial boilers—was deemed inferior to other possible uses. The Supreme Court approved the denial, saying that the Federal Power Commis- sion is authorized to consider end uses in determining "public convenience and necessity." 365 U.S. at 7, 81 S.Ct. at 438. By parity of reasoning, the Federal Communications Commission, in determining the issue now presented, can consider the "end use" or "end result" of the application made to it by appellant.

unreasonable condition for the granting of appellant's application to construct facilities from which Western would presumably benefit. The Commission deemed adequate protection of the local station to be in the public interest, and instead of denying appellant's application outright, as it might have done, it offered the appellant the opportunity to secure what it was seeking if it protected the public interest.

"4. Whether the Commission's denial constitutes unlawful or unconstitutional censorship of public communications."

Appellant urges that the First Amendment guarantees to Western the use of all possible means of public communication, free of any restraint or denial based on the competitive impact of the materials transmitted. Appellant also relies on the prohibition against censorship contained in Section 326 of the Communications Act of 1934, as amended, 47 U.S. C. § 326 (1958).

We do not consider that the Commission has violated either the constitutional or the statutory mandate. We do not have Western before us. Whatever the latter's rights generally may be, the appellant—and only the appellant—is seeking a license which the Commission, applying proper principles under the law, has denied. We cannot hold that appellant is entitled to the authorization sought, in derogation of those principles, merely because one of its customers claims to have rights of communication not available to the appellant.

It may be assumed that any denial of a license to transmit radio or television programs keeps off the air, and hence deprives the public of, the material which the applicant desires to communicate. But that does not mean that the Commission must grant every license which is requested. Nor does it mean that the whole statutory system of regulation is invalid. Quite the contrary is true: a denial of a station license, validly made because the standard of "public interest, convenience, or necessity" has

not been met, is not a denial of free speech. See National Broadcasting Co. v. United States, 319 U.S. 190, 226–227, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).

The Commission's offer to reconsider appellant's application if it shows that Western will not duplicate the local station's programs, and will make those programs available to Western's subscribers, appears to us to be a legitimate measure of protection for the local station and the public interest. The protection of the public interest does not amount to "censorship" within the meaning of Section 326. See Bay State Beacon v. Federal Communications Commission, 84 U.S.App.D.C. 216, 171 F.2d 826 (1948). See also KFKB Broadcasting Ass'n v. Federal Radio Commission, 60 App.D.C. 79, 47 F.2d 670 (1931).

"5. Whether the Commission made adequate findings explaining why the denial of a common carrier authorization under the circumstances of the instant case is a legally valid exercise of regulatory jurisdiction and not censorship of public communications, particularly in view of the Commission's contrary holdings in this regard."

Appellant's argument on this point is that prior to its decision in the instant case, "the Commission consistently has held that it cannot validly deny a common carrier authorization in order to reach a community antenna customer of the carrier and thus prevent an indirect economic impact upon a broadcast station." Appellant says that this policy should not be abandoned "except for the most cogent reasons," citing WOKO, Inc. v. Federal Communications Commission, 80 U.S.App.D.C. 333, 341, 153 F.2d 623, 631, reversed on other grounds, 329 U.S. 223, 67 S.Ct. 213, 91 L.Ed. 204 (1946). Assuming that there has been a change of policy on the part of the Commission, we think it supplied convincing and fully adequate reasons for its action in the present case, as appears elsewhere in this opinion, and we cannot say that the decision results in unfair or discriminatory treatment of the appellant.

"6. Whether the Commission's conclusion that a grant of Appellant's application would result in the demise of a television broadcast station is supported by adequate findings and by substantial evidence."

Appellant's principal contention in this regard is that the record does not show, and the Commission did not adequately find, that the antenna systems (if and when they received improved service from appellant under the proposed arrangement) would be "the decisive factor in the predicted demise of the [local] station."

Although matters of this sort are difficult of appraisal, we think the record amply supports the Commission's conclusion that the unconditional grant of appellant's application would probably result in the demise of KWRB–TV. Under existing conditions, that station since its inception in December 1957 has been operating in the "red," but in each succeeding year the gap between its income and operating expenses has decreased, with the real possibility that eventually it will operate in the black. The improving financial outlook is attributable to several factors: the better picture offered by KWRB–TV over that of the CATV system, in instances where the same network programs were carried both by KWRB–TV and one or more of the CATV cable channels; a decrease in the number of subscribers to the CATV cable in part of the area served by KWRB–TV; the fact that KWRB–TV is a family enterprise with low expenses [7] and high productivity; the substitution by KWRB–TV of network programming, for which charges are not made, in place of syndicated film purchases; and primarily its increasing sales of local spot advertising because of its widening network affiliations and the gain in viewers resulting from the decrease in the number of subscribers to the CATV cable.

If appellant's application were granted, the service which could be offered by the Western systems would be improved. Western could offer subscribers a better picture. It is probable that new subscribers would be attracted and that many, if not most, of the subscribers would view only the stations on the CATV cable. The conclusion is certainly warranted on these facts that the local station would find it increasingly difficult to sell advertising, its best source of income, in the light of this potential shift in listener-viewer reception, and its survival would be seriously jeopardized.

The local station of course has already been licensed, and its overall programming has been found to serve the public interest. It has a good local operating record, and it programs for the community it serves. Its arrangements with the three networks with which it is affiliated permit it to carry their entire programs, but to delete the "commercials" and substitute "public service." It carries public service "spots" on behalf of its own community. The closing of the station would mean that no local programs of this type would be available to residents of at least half of the area served. Furthermore, other serious consequences would follow the closing of the local station. The record shows that it is too costly for the CATV cables to enter rural areas. Out of a total population of 73,966 persons (by the 1960 Advance Census Reports) in the area served by the local station, 43,600 lived in rural areas (including towns of less than 2,500 persons). Forty thousand of these persons would be without any television service at all if the local station went out of business.[8] Moreover, in the six urban areas where the CATV cables operated on a subscription basis, the 24,393 residents would be deprived of free television service if the local station failed, and thereafter would have television coverage available only if they subscribed

---

7. The owners apparently have not yet received salaries or other distributions from the station.

8. In two towns of less than 2,500 persons each, having a combined population of 3,605, the CATV cables provided service to those who subscribed for it.

and paid for it. We think that the Commission justifiably concluded that the continuance of the local station served the public interest, and that it was fully warranted in imposing conditions, designed to protect that station, for the reconsideration of appellant's application.

The Commission's order will be

Affirmed.