**GENERAL TELEPHONE COMPANY OF CALIFORNIA et al., Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

Storer Broadcasting Company, Teleprompter Corporation, National Cable Television Assn., Inc., United States of America, Intervenors.

**UNITED INTER–MOUNTAIN TELEPHONE COMPANY et al., Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

Storer Broadcasting Company, Teleprompter Corporation, et al., Sterling Information Services, Ltd., National Cable Television Assn., Inc., United States of America, Intervenors.

**UNITED TELEPHONE COMPANY OF OHIO et al., Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

Storer Broadcasting Company, Warrensburg Cable, Inc., Teleprompter Corporation, et al., Sterling Information Services, Ltd., National Cable Television Assn., Inc., United States of America, Intervenors.

**The CHESAPEAKE AND POTOMAC TELEPHONE COMPANY OF VIRGINIA et al., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

Teleprompter Corporation, Inc., National Cable Television Assn., Inc., Storer Broadcasting Company, City of New York, Cox-Cosmos, Inc., Intervenors.

**NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

Teleprompter Corporation, et al., National Cable Television Assn., Inc., Storer Broadcasting Company, Intervenors.

Nos. 22106, 22112, 22113, 22116, 22143.

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 17, 1969.

Decided April 30, 1969.

Certiorari Denied Oct. 27, 1969. See 90 S.Ct. 173, 178.

392

———◆———

Mr. David H. Lloyd, Washington, D. C., with whom Messrs. Paul A. Porter, Reed Miller and Robert D. Rosenbaum, Washington, D. C., were on the brief, for appellants in No. 22,106.

Mr. Warren E. Baker, Washington, D. C., with whom Messrs. Edmund E. Harvey and Lloyd D. Young, Washington, D. C., were on the brief, for appellants in Nos. 22,112 and 22,113.

Mr. Hugh B. Cox, Washington, D. C., with whom Messrs. E. Edward Bruce, Washington, D. C., Lewis H. Ulman and John F. Preston, Jr., New York City, were on the brief, for petitioners in No. 22,116. Mr. Paul F. McArdle, Washington, D. C., also entered an appearance for petitioners in No. 22,116.

Mr. Paul Rodgers for petitioner in No. 22,143.

Mr. John H. Conlin, Associate General Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, Federal Communications Commission, and Howard E. Shapiro, Atty., Department of Justice, were on the brief, for appellee in Nos. 22,106, 22,112 and 22,113 and respondents in Nos. 22,116 and 22,143. Mr. Howard E. Shapiro, Atty., Department of Justice, also entered an appearance for intervenor, United States of America, in Nos. 22,106, 22,112, 22,113 and respondents in Nos. 22,116 and 22,143. Mrs. Lenore G. Ehrig, Washington, D. C., also entered an appearance for appellees in Nos. 22,106, 22,112, 22,113 and respondents in Nos. 22,116 and 22,143.

Mr. Alan Raywid, Washington, D. C., with whom Messrs. John P. Cole, Jr., Washington, D.C., and William J. Levy,

were on the brief, for intervenors, Teleprompter Corporation, et al. Mr. Roger E. Zylstra, Washington, D. C., also entered an appearance for intervenor, Teleprompter Corporation, et al.

Mr. Bruce E. Lovett, Washington, D. C., was on the brief for intervenor, National Cable Television Association, Inc.

Mr. William P. Sims, Jr., Washington, D. C., was on the brief for intervenor, Cox-Cosmos, Inc., in No. 22,116.

Messrs. J. Lee Rankin and John R. Thompson, New York City, were on the brief, for intervenor, City of New York, in No. 22,116. Mr. Francis I. Howley, New York City, also entered an appearance for intervenor, City of New York, in No. 22,116.

Messrs. Bernard Koteen, Alan Y. Naftalin and Victor E. Ferrall, Jr., Washington, D. C., entered appearances for intervenor, Storer Broadcasting Company.

Messrs. James E. Greeley, Marshal L. Cole, and Edward P. Taptich, Washington, D. C., entered appearances for intervenor, Warrensburg Cable, Inc., in No. 22,113.

Before BURGER, WRIGHT and ROBINSON, Circuit Judges.

BURGER, Circuit Judge:

Petitioners and Appellants seek review to vacate a Decision and Order of the Federal Communications Commission under which the Commission determined that a certificate of public convenience and necessity was required for the construction of distribution facilities to provide channel service to community antenna television systems, commonly called CATV. Petitioners and Appellants are operating telephone companies and their corporate parents, the American Telephone and Telegraph Company, General Telephone System, and United Utilities, Inc. For convenience all parties challenging the Commission's action will be referred to as "Petitioners."

### (1) BACKGROUND

The Commission held that Section 214 (a) of the Communications Act of 1934,

47 U.S.C. § 214(a) (1962) [1] grants the Commission jurisdiction over common carrier facilities used to provide local distribution channel service to CATV operators transmitting broadcast signals from another state, notwithstanding that the particular distribution facilities are located within the boundaries of a single state. The Petitioners contended the facilities were intrastate and local in nature and hence not subject to the certification requirements of Section 214(a).

The Commission order directed the companies to file applications for construction certificates for all CATV channel service construction then in process and to cease and desist from further construction, and from the operation of existing facilities (with certain exceptions and qualifications) until certificates issued.

A CATV television system consists of three basic components:

(a) the receiving apparatus which picks up, by means of high antennae or microwave transmission, signals transmitted by television and FM radio;

(b) the "headend" apparatus which converts, modifies and modulates the signal by electronic equipment so that the signal received can be transmitted along a coaxial cable; and

(c) the coaxial cable distribution system which carries the converted signal to the premises of the CATV subscriber.

This third component (c) consists of three parts: the trunk or "feeder" coaxial cable which begins at the headend and carries the signal on the first leg of its journey, the distribution cables which carry the signal from the "feeder" lines to the immediate vicinity of the subscriber, and the "droplines" which carry it from the distribution cable to the terminal block on the subscriber's premises.[2]

Many CATV operators have constructed their own facilities for reception and distribution and the Commission does not assert common carrier jurisdiction over such systems. Others run their distribution cable over existing poles of utility systems by private contract with that utility. Neither of these types of operations involves a common carriage. Other CATV operators contract with a telephone system to provide the entire channel service distribution which carries the signal from the headend to the subscriber's home. In this proceeding the Commission considered only this latter mode of distribution by which the Petitioners supplied channel service transmission.

### (2) COMMISSION PROCEEDINGS

In April 1966, the Commission initiated a proceeding and directed the operating companies of the General Telephone System and Bell System to file tariffs covering CATV channel distribution facilities. Bell and General did so under protest and a petition for reconsideration was denied.[3] In October

---

1. For the full text of Section 214(a) see note 11, *infra*.

2. A final "cable" is then run from the terminal block to the subscriber's television set.

    The coaxial cable utilized by the carriers to provide the service can simultaneously carry 12 television channels at VHF frequencies and the entire FM radio band.

3. Common Carrier Tariffs for CATV systems, 4 F.C.C.2d 257 (1966). In reaffirming its jurisdictional base for requiring the filings, the Commission re-

lied upon Section 202(b), 47 U.S.C. § 202(b) (1962), and this court's decision in Idaho Microwave, Inc. v. FCC, 122 U.S.App.D.C. 253, 352 F.2d 729 (1965). The Commission also explained:

A.T.&T. claims that the CATV operator performs certain conditioning and intervening procedures before the TV signals are further transmitted over the service in question. However, no claim is made that there is any significant interruption of the continuous flow of the signals from the TV station to the home viewer or that the program material transmitted by the TV station

1966, the Commission initiated an inquiry into the lawfulness of tariffs filed by General Telephone Company of California.[4] Thereafter, similar proceedings were initiated as to the operating subsidiaries of Bell,[5] General, and United Utilities, Inc.[6] These proceedings were expanded to include not only questions of the lawfulness of tariffs, but also the applicability of Section 214 of the Communications Act. By Order adopted January 11, 1967, all the above proceedings were consolidated for hearing.[7]

Subsequently, in Orders adopted March 29, 1967 and released April 3, 1967, the Commission deleted the Section 214 issues from the above-mentioned consolidated hearings[8] and initiated a separate consolidated proceeding to hear these issues.[9] This action was taken in response to allegations by General and California that insofar as the proceedings dealt with Section 214 matters, they were adjudicatory in nature and required the more formal procedural strictures of adjudicatory determinations. The Commission reasoned that in addition to resolving the purely legal questions, the Section 214 "issues contemplate that the

Commission may take specific remedial actions, including the issuance of cease and desist orders, against individual carriers on the basis of the evidence adduced." 7 F.C.C.2d at 572. Therefore, the Section 214 questions were excised and designated for separate hearing on the following issues:

(a) Whether (with respect to the Bell Systems companies) the requirements of section 214 of the act and part 63 of our rules implementing that section have been met as to the facilities used to offer channel service under the aforesaid tariffs and, if not, what action, if any, the Commission should take with respect thereto;

(b) Whether (with respect to the non-Bell System companies) any of the respondents are subject to the requirements of section 214 of the act and part 63 of our rules implementing that section and, if so, whether these requirements have been met as to the facilities used to offer CATV channel service under the aforesaid tariffs and what action, if any, the Commission

---

is materially different from the program material received by the home viewer from such station.

\* \* \* \* \*

As we have heretofore stated, we think it clear that we are dealing with the regulation of tariffs for interstate communication service.

\* \* \* \* \*

14. It is true, as argued by A.T. & T., that the Commission has disclaimed tariff regulatory jurisdiction over CATV operators. However, such disclaimer followed from our finding that CATV operators are not engaged as communication common carriers within the contemplation of the Communications Act and that therefore such operators are beyond the reach of section 202(b) of the act. We are unable to make any such disclaimer in the case of telephone companies which furnish channels of communication to CATV operators, for the provision of such service is clearly a common carrier undertaking. Thus, the short answer to A.T. & T.'s policy arguments is that Congress has sup-

plied the controlling policy guidance in section 202(b) of the act, recognizing, as it does, that there is a need for regulatory consideration by the central Federal agency of this type of activity by a common carrier, linked as it is with broadcasting.
4 F.C.C.2d at 259–260.

4. California Water and Tel. Co., 5 F.C.C.2d 229 (1966). California Water and Telephone was subsequently merged with General Telephone Company of California and the latter was substituted as a party to the proceedings.

5. The Associated Bell Systems Cos., 5 F.C.C.2d 357 (1966).

6. The General Tel. System, *et al.*, 6 F.C.C.2d 434 (1967).

7. California Water and Tel. Co., *et al.*, 6 F.C.C.2d 440 (1967).

8. California Water and Tel. Co., *et al.*, 7 F.C.C.2d 571 (1967).

9. California Water and Tel. Co., *et al.*, 7 F.C.C.2d 575 (1967).

should take with respect thereto. 7 F.C.C.2d at 576.

Following the evidentiary hearing and the Examiner's certification of the record pursuant to Section 409(a) of the Act the Commission heard oral argument *en banc*, and its Decision and Order were released on June 26, 1968. General Tel. Co. of California *et al.*, 13 F.C.C.2d 448 (1968).[10] Essentially, the Commission found that the CATV channel service furnished by the carriers constituted "a common carrier undertaking" and that Section 214 certificates of public convenience and necessity were required for the construction of the channel distribution systems employed in providing this interstate communications service.[11] The Commission also determined that the service provided by these carriers was not "intrastate communication service" within the Section

---

10. The Commission's view of the issues raised are:

(1) whether the channel service offerings relate to common carrier communications service undertakings; (2) whether the intelligence transmitted or to be transmitted by the telephone companies are interstate communications subject to the Commission's jurisdiction; (3) whether the construction under consideration, which does not cross a state boundary, is purely an intrastate line and therefore exempt under Section 214(a) (1) from the certification requirements or is part of an interstate line; (4) even if part of an interstate line, whether the construction relates to facilities which are "local, branch, or terminal lines not exceeding ten miles in length" and therefore exempt pursuant to Section 214(a) (2) of the Act; and (5) whether the service offered in each of the several tariffs is a "telephone exchange service" within the contemplation of Section 221(b) of the Act and therefore not subject to Commission jurisdiction. On behalf of those carriers which heretofore have been classified as "connecting carriers" pursuant to the provisions of Section 2(b) (2) of the Act, the contention is advanced that Section 214(a) is inapplicable to them even if determined to be applicable to the "fully subject" carriers.

13 F.C.C.2d at 453–54 (1968).

11. Section 214(a), 47 U.S.C. § 214(a) (1962), provides:

(a) No carrier shall undertake the construction of a new line or of an extension of any line, or shall acquire or operate any line, or extension thereof, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line: *Provided*, That no such certificate shall be required under this section for the construction, acquisition, or operation of (1) a line within a single State unless such line constitutes part of an interstate line, (2) local, branch, or terminal lines not exceeding ten miles in length, or (3) any line acquired under section 221 or 222 of this title: *Provided further*, That the Commission may, upon appropriate request being made, authorize temporary or emergency service, or the supplementing of existing facilities, without regard to the provisions of this section. No carrier shall discontinue, reduce, or impair service to a community, or part of a community, unless and until there shall first have been obtained from the Commission a certificate that neither the present nor future public convenience and necessity will be adversely affected thereby; except that the Commission may, upon appropriate request being made, authorize temporary or emergency discontinuance, reduction, or impairment of service, or partial discontinuance, reduction, or impairment of service, without regard to the provisions of this section. As used in this section the term "line" means any channel of communication established by the use of appropriate equipment, other than a channel of communication established by the interconnection of two or more existing channels: *Provided, however*, That nothing in this section shall be construed to require a certificate or other authorization from the Commission for any installation, replacement, or other changes in plant, operation, or equipment, other than new construction, which will not impair the adequacy or quality of service provided.

2(b) (1) exemption.[12] In addition the Commission determined that the construction in question did not fall within the exemptions of Section 214(a) (1) covering "a line within a single State unless such line constitutes part of an interstate line." Likewise, the Section 214(a) (2) exemption covering "local, branch, or terminal lines not exceeding ten miles in length," and the Section 221 (b) provision exempting "services, facilities * * * for or in connection with * * * telephone exchange service" were found to be inapplicable.[13] The Commission also rejected the contentions of those petitioners which claimed that their prior classification as "connecting carriers" exempted them from its regulatory authority pursuant to Section 2 (b) (2) of the Act.[14]

Pursuant to these findings the Commission directed the operating telephone companies of Bell, General, and United to file applications for certificates of public convenience and necessity pursuant to Section 214 as respects all construction theretofore undertaken to provide channel service to CATV systems. The Commission also directed these parties to cease and desist from constructing additional facilities until certificates have been obtained, and to cease and desist from operating previously completed facilities until applications for certification had been filed and certain additional conditions had been met. These conditions varied to meet special problems of individual carriers and included references to the particular party's date of notice of the possible applicability of Section 214, the percentage of construction and expenditure up to the notice date, and the nature of the affiliation existing between the particular carrier and CATV operator.[15]

### (3) QUESTIONS PRESENTED

The basic and dispositive issue is whether the Communications Act vests in the Commission jurisdiction over channel transmission service and facilities of telephone companies constructed to carry TV and FM radio signals by wire between a CATV antenna (or microwave received) and the subscribers, when the reception and transmission facilities are entirely within one state and when they are constructed to provide transmission service to CATV operators carrying signals which originate from

---

12. Section 2(b), 47 U.S.C. § 152(b) (1962), provides in relevant part:

(b) Subject to the provisions of section 301 of this title, nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier, or (2) any carrier engaged in interstate or foreign communication solely through physical connection with the facilities of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier * * *.

13. Section 221(b), 47 U.S.C. § 221(b) (1962), provides:

(b) Subject to the provisions of section 301 of this title, nothing in this chapter shall be construed to apply, or to give the Commission jurisdiction, with respect to charges, classifications, practices, services, facilities, or regulations for or in connection with wire, mobile, or point-to-point radio telephone exchange service, or any combination thereof, even though a portion of such exchange service constitutes interstate or foreign communication, in any case where such matters are subject to regulation by a State commission or by local governmental authority.

14. For the text of Section 2(b) (2), 47 U.S.C. § 152(b) (2) (1962), see note 12, *supra*.

15. In a Memorandum Opinion and Order adopted July 26, 1968, the Commission partially stayed the provisions of its cease and desist orders pending review in this court. Those provisions relating to the construction of new facilities or the operation of facilities fully or partially constructed but not operational on the date of the Commission's principal opinion were not stayed; all other provisions relating to CATV channel distribution facilities constructed and in operation on or before June 26, 1968, were stayed. General Tel. Co. of Cal., *et al.*, 14 F.C.C.2d 170 (1968).

TV and FM broadcasters in another state.

An additional question, assuming such jurisdiction exists, is whether the Commission is authorized to enter a cease and desist order under Section 312.

Some hint of the magnitude and significance of the problems raised on this appeal is suggested by the growth of CATV in a brief period and the extent of the involvement of the telephone carriers in providing distribution facilities and service to CATV operators. By 1967 six of the 33 operating companies of the General Telephone and Electronics Corporation were involved in eight channel services, and other construction was contemplated; other General operating companies were directly engaged in CATV operation. A wholly owned General subsidiary engaged in CATV is a customer in 10 of the distribution systems of General carries; this subsidiary owned 36 CATV systems and franchises.

Bell System Companies by 1967 were supplying channel transmission services to 178 separate communities identified in the record. United Utilities, parent of the United operating telephone companies, supplied channel service in 31 communities; in all but one of these communities United Utilities is the sole or major stockholder in these CATV systems.

A summary of Petitioners' investment in channel service indicated that General has invested over $2,000,000 in ten communities; United, $800,000 in six communities; Bell, $1,360,000 in four communities. Bell's total investment cost in channel service systems is in excess of $43,000,000, and other telephone systems have also invested large sums. The projected future development is not indicated in the record but the amounts involved for the number of communities now being served suggest the magnitude of the potential in CATV distribution by common carriers.

### (4) NATURE OF SERVICES

The primary challenge to the Commission's action is that it has improperly asserted jurisdiction over intrastate activities. Such regulation, it is contended, trangresses the original congressional distinction between local and national activities, a dividing line which was drawn to achieve a balance between state and national regulation rather than to allow preemption of local control by comprehensive federal regulation. Great reliance is placed on the fact that the physical facilities of all but one of the common carrier lines used for CATV distribution service are located within the boundaries of a single state [16] and on Section 2(b) (1) of the Act which provides in part:

> (b) Subject to the provisions of section 301 of this title, nothing in this chapter shall be construed to apply to or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations *for or in connection with intrastate communication service by wire or radio of any carrier* * * *.

47 U.S.C. § 152(b) (1964) (emphasis added).

The Petitioners insist that service wholly within a single state, when there is no common carriage *across* state lines, is "intrastate service," even though the subject matter of that service—the interstate broadcast signal—may itself be regarded as interstate communication. In their view the crucial fact is *the character of the common carrier service and facilities involved.* This, and not the transmission itself, it is argued, should determine whether a communication service is intrastate or interstate in character; Petitioners insist that it is error for the Commission to consider interstate communication as the functional equivalent of interstate communication *service.*

16. The Commission did not question the intrastate physical location of the facilities in arriving at its determination. It listed United Telephone Company of the Northwest as the only operating company with cable facilities crossing a state boundary. This determination was not challenged. 13 F.C.C.2d at 455 n. 15.

In evaluating this contention the Commission placed chief reliance on what it considered to be an examination of the actual service which the carriers perform in relation to the total transmission process which carries the broadcast signal from the broadcaster to the television set of the individual viewer:

> The controlling facts here are that the cable facilities furnished by the telephone companies are links in the continuous transmission of the signals from the point of origin to the set of the viewer, and the intelligence received by the viewer is essentially the same as that transmitted by the broadcaster. *Irrespective of the location of its physical facilities, the common carrier which thus participates as a link in the relay of television signals is performing an interstate communications service.*

13 F.C.C.2d at 455 (1968) (emphasis added).

At the time of the enactment of the Communications Act, Congress could not and indeed did not try to anticipate all of the developments which might occur.[17] Fundamentally it viewed the "air waves" as a public resource to be utilized and regulated in the public interest. Basic to its approach was that radio broadcasting was subject to federal jurisdiction without regard to transmission over state lines in the traditional interstate commerce sense.

Over the years, the Commission has been required to meet new problems concerning CATV and as cases have reached the courts the scope of the Act has been defined, as Congress contemplated would be done, so as to avoid a continuing process of statutory revision.[18] To do otherwise in regulating a dynamic public service function such as broadcasting would place an intolerable regulatory burden on the Congress—one which it sought to escape by delegating administrative functions to the Commission.

■ Our evaluation of the Commission's interpretation of the scope of its jurisdiction must take into account the Act's broad purposes and objectives. We cannot ignore specific exemptions and limitations which narrow its regulatory powers, but neither can we overlook that Congress sought to establish a pervasive jurisdiction over broadcasting. The Act must be construed in light of the needs for comprehensive regulation and the practical difficulties inhering in state by state regulation of parts of an organic whole.

Petitioners point out that Section 2(a) of the Act is limited "to all interstate and foreign communication by wire or radio * * *" and from this argue that intrastate communication is thereby necessarily excluded. The relationship of Section 2(a) and 2(b) (1) is suggested as emphasizing the exclusion of communication facilities within one state.

In Idaho Microwave, Inc. v. FCC, 122 U.S.App.D.C. 253, 352 F.2d 729 (1965), we dealt with the Commission's power to regulate, by use of conditions on a license, microwave communication facilities located entirely within the State of Idaho, but used to carry signals from Utah stations to a CATV system in Burley, Idaho. Our holding in pertinent part was:

> * * * The Burley facility is used as a link in the continuous transmission of television signals from Salt Lake City to Burley, Idaho; there is no interruption in the flow of the sig-

17. *Cf.* Fortnightly Corp. v. United Artists, 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968).

18. *See* American Broadcasting Co. v. FCC, 89 U.S.App.D.C. 298, 304, 191 F.2d 492, 498 (1951), *quoting* FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940), where we explained:

> Underlying the [Communications Act] is recognition of the rapidly fluctuating factors characteristic of the evolution of broadcasting and of the corresponding requirement that the administrative process possess sufficient flexibility to adjust itself to these factors.

nals, as it is practically instantaneous. Thus, though Idaho Microwave's physical facilities are located within Idaho, it performs an interstate communication service when it takes part in the transmission of signals from Utah to Idaho.

*Id.* at 256, 352 F.2d at 732, *citing,* Ward v. Northern Ohio Tel. Co., 300 F.2d 816 (6th Cir.), cert. denied, 371 U.S. 820, 83 S.Ct. 37, 9 L.Ed.2d 61 (1962); *see* Pacific Teletronics, Inc., 37 F.C.C. 1163 (1964).

Similarly in California Interstate Tel. Co. v. FCC, 117 U.S.App.D.C. 255, 328 F.2d 556 (1964), we found no difficulty in affirming a Commission determination that broadcast signals from Pasadena to Goldstone, both within California, for relay to spacecraft were a part of "foreign commerce" and subject to federal jurisdiction:

> It is true that the only earth stations involved in this system are at Goldstone and Pasadena, both in California. The record shows, however, that the purpose of the system is to provide communication between spacecraft and Pasadena, the "bouncing through" Goldstone being practically instantaneous. Voice communications between Goldstone and Pasadena will be subordinate to data, and will be used primarily to coordinate the system and to check on its operating characteristics. Being merely adjuncts to the transmission of signals between Pasadena and spacecraft, the voice and data transmissions between Pasadena and Goldstone will be, as the California Commission said, "secondary and subsidiary to the primary use of radio communication and data transmission in interstate or foreign commerce."

*Id.* at 259, 328 F.2d at 560.

Petitioners point out that the Bell System operating companies have held out common carrier channel service for local service to CATV operators since 1959, but that the Commission asserted no jurisdiction until the 1966 proceedings. Prior to 1966 such common carrier service was subject only to local and state agencies and tariffs for such service had been filed where required. It is also correct that in 1959 the Commission expressed the view that although CATV related to interstate communication it did not contemplate regulation of such systems. However, the explosive growth of CATV led the Commission to alter its view, particularly after the Congress failed to adopt amendments which would have clarified the status of CATV. See Second Report & Order, 2 F.C.C.2d 725, 738 n. 15.

An early step was to regulate the activities of common carrier microwave facilities serving CATV systems. In Carter Mountain Transmission Corp. v. FCC, 116 U.S.App.D.C. 93, 321 F.2d 359, cert. denied, 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963), we reviewed a Commission decision which had denied an application by a common carrier to construct a microwave radio communication system to serve a CATV operator. The Commission action was based on the finding that a grant would not serve the public interest because of the adverse impact on a local television station. In challenging the Commission's determination, the carrier asserted that the Commission had erroneously applied principles of "radio broadcast law" to a situation involving "common carrier licensing." This challenge was in part based upon the proposition that the Communications Act contemplates the regulation of common carriers "in analogy to the regulation of rail and other carriers by the Interstate Commerce Commission." *Id.* at 96, 321 F.2d at 362.

We rejected this stilted interpretation of the Act recognizing the vast difference between "questions of competitive injury in the transportation field" and "questions of public injury in the field of communications." *Id.* In doing so, we emphasized the soundness of allowing the Commission to consider its total regulatory responsibilities when

dealing with problems within a particular area of its jurisdiction:

> Here the Federal Communications Commission is charged with the duty of regulating not only common carriers by radio but broadcasters of television programs. It cannot let its decisions in the radio carrier field interfere with its responsibilities in the television broadcasting field. In both fields, it must "make available, so far as possible, to all the people of the United States," adequate and efficient service.

*Id.*

In United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968), the Supreme Court had occasion to review the brief but spectacular history of CATV growth. Justice Harlan, for the Court, noted that in 1962, the Commission had reconsidered and re-evaluated the significance of CATV and the scope of the Commission's responsibilities, and it concluded that "the likelihood or probability of (CATV's) adverse impact upon potential and existing services has become too substantial to be dismissed." First Report & Order, 38 F.C.C. 683, 713–714. The Second Report & Order, 2 F.C.C.2d 725, followed, in which the Commission determined that the Act confers regulatory authority over all CATV systems. In exercise of this comprehensive jurisdiction the Commission restricted the importation by CATV of distant signals into the 100 largest TV markets. *Id.* at 781–785.

Addressing the issues raised in *Southwestern Cable*, Justice Harlan then said:

> We must first emphasize that questions as to the validity of the specific rules promulgated by the Commission for the regulation of CATV are not now before the Court. The issues in these cases are only two: whether the Commission has authority under the Communications Act to regulate CATV systems, and, if it has, whether it has, in addition, authority to issue the prohibitory order here in question.

The Commission's authority to regulate broadcasting and other communications is derived from the Communications Act of 1934, as amended. The Act's provisions are explicitly applicable to "all interstate and foreign communication by wire or radio * * *." 47 U.S.C. § 152(a). The Commission's responsibilities are no more narrow: it is required to endeavor to "make available * * * to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service * * *." 47 U.S.C. § 151. The Commission was expected to serve as the "single Government agency" with "unified jurisdiction" and "regulatory power over all forms of electrical communication, whether by telephone, telegraph, cable, or radio." It was for this purpose given "broad authority." As this Court emphasized in an earlier case, the Act's terms, purposes, and history all indicate that Congress "formulated a unified and comprehensive regulatory system for the (broadcasting) industry." FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 137 [60 S.Ct. 437, 439, 84 L.Ed. 656].

Respondents do not suggest that CATV systems are not within the term "communication by wire or radio." Indeed, such communications are defined by the Act so as to encompass "the transmission of * * * signals, pictures, and sounds of all kinds," whether by radio or cable, "including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission." 47 U.S.C. §§ 153(a), (b). These very general terms amply suffice to reach respondents' activities.

Nor can we doubt that CATV systems are engaged in interstate communication, even where, as here, the intercepted signals emanate from stations located within the same State in which the CATV system operates. We

may take notice that television broadcasting consists in very large part of programming devised for, and distributed to, national audiences; respondents thus are ordinarily employed in the simultaneous retransmission of communications that have very often originated in other States. The stream of communication is essentially uninterrupted and properly indivisible. To categorize respondents' activities as intrastate would disregard the character of the television industry, and serve merely to prevent the national regulation that "is not only appropriate but essential to the efficient use of radio facilities." Federal Radio Comm'n v. Nelson Bros. Co., 289 U.S. 266, 279, 53 S.Ct. 627, 77 L.Ed. 1166.

392 U.S. at 167–169, 88 S.Ct. at 2000 (footnotes omitted).

As we view the record now before us and consider it in light of our own holdings and the relevant holdings of the Supreme Court it seems clear that as the outlines of the CATV problem emerged the Commission acted within the scope of the Act and consistently with the broad purposes of the Act by treating its responsibilities as comprehensive and pervasive. Any other determination would tend to fragment the regulation of a communications activity which cannot be regulated on any realistic basis except by a central authority; fifty states and myriad local authorities cannot effectively deal with bits and pieces of what is really a unified system of communica-

tion. The Supreme Court aptly characterized the functional aspect of the CATV systems as an "essentially uninterrupted and properly indivisible" stream of communication.

■■ The Commission has construed it own statutory grant after much study and indeed not without periods of doubt and reservation as embracing all links, including strictly intrastate links, as being part of the interstate transmission. Its interpretation of its grant and its application are entitled, of course, to great deference. The Petitioners have, by choice, inserted themselves as links in this indivisible stream and have become an integral part of interstate broadcast transmission. They cannot have the economic benefits of such carriage as they perform and be free of the necessarily pervasive jurisdiction of the Commission. Federal Radio Comm'n v. Nelson Bros. Bond & Mtge. Co., 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166 (1933).

### (5) Applicability of Exemptions Under Section 214

■■ Notwithstanding the Commission's determination that Petitioners are engaged in providing interstate communication services, the Petitioners assert that various specific provisions of the Act, apart from their claims of the intrastate character of their facilities, exempt them from Commission jurisdiction. Having previously rejected their major premise, our consideration of these arguments has been facilitated.[19]

19. The carriers assert two exemption claims which we feel do not merit extended discussion.

The first rests on Section 221(b)'s exclusion of facilities "for or in connection with * * * telephone exchange service." See note 13, *supra*, for the full text of Section 221(b). On this point, we agree with the Commission's summary rejection of this contention as "inconsistent with the plain meaning of the words used." Section 3(r) of the Act, 47 U.S.C. § 153(r) (1964), defines "telephone exchange service" as:

service · within a telephone exchange, or within a connected system of tele-

phone exchanges within the same exchange area operated to furnish to subscribers intercommunicating service of the character ordinarily furnished by a single exchange, and which is covered by the exchange service charge.

Clearly, CATV channel distribution service does not contemplate furnishing subscribers with "intercommunicating service" of the type usually identified with a telephone exchange.

A second claim of exemption rests on Section 2(b) (2)'s exclusion of carriers "engaged in interstate or foreign communication solely through physical connection with the facilities of another

Petitioners contend that the cable distribution systems employed by all but one operating company [20] are exempt by Section 214(a) (1)'s exclusion of "a line within a single State unless such line constitutes part of an interstate line" because none of their facilities cross a state boundary. The Commission met this allegation directly by relying on the Section 214(a) definition of "line" as "any channel of communication established by the use of appropriate equipment." The Commission did not read Section 214(a) (1) to mean that an interstate common carrier line had to be connected to an interstate *common carrier line* before it could be subjected to certification requirements.

Given the already articulated interstate nature of the service being provided, we cannot conclude that the Commission abused its authority to construe these remedial provisions in a way to effectuate the ultimate regulatory scheme of the Act.[21] These carriers are an integral component in the indivisible dissemination system which forms an interstate channel of communication from the broadcaster to the viewer. As such, they are reasonably characterized as a "part of an interstate line" within the language of Section 214(a) (1).

The correctness of this analysis becomes even more evident when the alternative offered by the carriers is considered. As noted previously, the Commission has jurisdiction over broadcast-ers and CATV operators. Likewise, the Commission has jurisdiction over the construction and alteration of interstate common carrier facilities pursuant to the general provisions of Section 214(a). Here, the channel distribution systems are provided by common carriers to already-regulated CATV operators who in turn are merely relaying the signals of fully-regulated broadcasters. Therefore, coaxial cable construction by these operating telephone companies directly affects two types of operations already subject to Commission regulation and is provided by a party otherwise covered by Title II common carrier provisions. To give the Act the overly restrictive interpretation urged by Petitioners would be to prevent the Commission from employing the regulatory devices which have been established for effective common carrier control—a particularly sterile result when the carrier activity is augmenting the operations of parties which are the particular concern of the Commission's regulatory responsibility. *See Carter Mountain, supra.* We have previously noted that the Commission's regulatory and enforcement powers should not be artificially fragmented or compartmentalized when the result would be to frustrate a comprehensive, pervasive regulatory scheme.[22]

The other major basis for the carriers' claim of exemption is Section 214(a) (2)'s exclusion of "local, branch, or terminal lines not exceeding ten miles in

carrier * * *." See note 12, *supra,* for the full text of Section 2(b) (2). The Commission decided only that the *CATV channel service* provided by the connecting carriers in question is not exempted from Section 214(a)'s certification requirements. This ruling in no way affected their status as connecting carriers with respect to their other interstate activities which continue to fall within the legitimate intendment of § 2 (b) (2). We agree with the Commission's view that the "character of the communication" which prompts the construction is the pertinent consideration. *See* Ward v. Northern Ohio Tel. Co., *supra.* The exclusion embodied in Section 2(b) (2) was meant to protect

State jurisdiction over local telephone facilities which could place interstate calls through their connection with major toll lines; this interstate facet of the company's operation was incidental to its primary local service. To characterize the interstate connections of a CATV channel distribution system as "incidental" to any other function it may perform would be at best a myopic view of its true activities.

20. See note 16, *supra.*

21. *See* note 18, *supra.*

22. *See* Buckeye Cablevision, Inc. v. FCC, 128 U.S.App.D.C. 262, 267, 387 F.2d 220, 225 (1967). *See also* discussion in part 6, *infra.*

length." In dismissing this assertion, the Commission never reached the ten-mile-length limitation because it determined that the establishment of these channel distribution systems constituted construction of " 'main' communication lines which should have been certificated." This finding rested on the conclusion that the concept of "local, branch, or terminal" lines is not consist with the proposed construction of facilities which will involve "new construction by the telephone companies in order to provide new customers with a type of service significantly different from that theretofore provided in said communities." 13 F.C.C.2d at 459.

This provision of Section 214(a) has not been previously construed, and the legislative history does not furnish dispositive guidance. We therefore are confronted with the well-accepted rule that the administrative agency should be given deference in its interpretation of the statutory scheme it is charged with administering.[23] This is particularly appropriate when the reviewing court preliminarily views the interpretation as one directed at achieving the reasonably authorized purposes of the legislation in question.[24]

■ In this instance, we are persuaded that the Commission has focused on the central purpose of this exemption. Section 214(a) (2) was mean to permit nonsubstantial improvements or extensions for existing carrier facilities without calling for a continuous stream of burdensome applications for Commission approval. *Cf.* Texas & Pac Ry. Co. v. Gulf, Colo. & S. F. Ry. Co., 270 U.S.

266, 46 S.Ct. 263, 70 L.Ed. 578 (1926).[25] It is reasonable to assume that Congress was not troubled by the prospect of a local telephone company running an extension line to a cluster of houses in a new subdivision near existing facilities. It is quite another matter to suggest that it meant to exempt a carrier's efforts to install an entire network consisting of "trunk," "distribution," and "dropline" cables to provide TV service via CATV to an area that has theretofore been without such broadcast distribution facilities.

■ We think that the Petitioners misconstrue the purpose of the exemption when they read its provision to encompass the *initial construction* of a distribution component capable of carrying broadcast signals to a substantial number of viewers. Without deciding the point, we may assume that they would be more comfortably within the intendment of Section 214(a) (2)'s exemption were they proposing the nonsubstantial extension of *existing channel service facilities* of the type now under consideration. Instead, they have sought to force the camel through the needle's eye by arguing that an exemption providing for improvements and extensions can be construed to allow the initial construction of facilities. The Commission's rejection of that proposition seems entirely sound to us.

### (6) THE COMMISSION'S CEASE AND DESIST ORDERS

■ The Petitioners also challenge the Commission's resort to the cease and desist provisions of Section 312(b) [26]

---

23. *E. g.,* Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Unemployment Comp. Comm'n v. Aragon, 329 U.S. 143, 67 S.Ct. 245, 91 L.Ed. 136 (1946); *see* Philadelphia Television Broadcasting Co. v. FCC, 123 U.S.App. D.C. 298, 359 F.2d 282 (1966).

24. *See* United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

25. *See also* 78 Cong.Rec. 10,314 (1934) (remarks of Rep. Rayburn); 78 Cong. Rec. 10,987 (1934) (remarks of Rep. Rayburn).

26. Section 312(b), 47 U.S.C. § 312(b) (1962), provides:
    (b) where any person (1) has failed to operate substantially as set forth in a license, (2) has violated or failed to observe any of the provisions of this

as a means of arresting the continued construction and operation of certain channel distribution systems.[27] The thrust of their argument is that Section 214(c) [28] embodies the Commission's exclusive method of enforcement to thwart abuses of the certification provisions. Section 214(c) allows the Commission to seek a court injunction to prevent construction or operation until the requirements of Section 214 are satisfied. This reasoning is based on the proposition that Section 312(b), which was inserted in Title III when the Act was amended in 1952, is completely inapplicable to the provisions of Title II dealing with the regulation of common carriers.

The direct answer to this analysis is contained in the language of the two sections. Initially, Section 312(b) makes clear that it is directed at *"any person * * * [who] has violated or failed to* observe *any of the provisions of this Act * * * [or] any rule or regulation of the Commission authorized by this Act * * *."* The pervasive application of the language employed in Sections 312 (b) (2) and 312(b) (3) is suggested by Section 312(b) (1)'s narrower reference to "any person [who] has failed to operate substantially *as set forth in a license * * *."* It seems that when the drafters intended to focus on licensees, they had no problem doing so.

Nor does the clear language of Section 214(c) suggest its exclusivity. The section employs *permissive* terminology in that "construction * * * operation * * * contrary to the provisions of this section *may be enjoined * * *."* Such language does not usually imply that no other remedy is contemplated. Moreover, in addition to the Commission, Section 214(c)'s enforcement techniques are available to the United States, a state or state commission, or any party in interest. This too would suggest that it was not meant to be a remedy particularly adapted to the needs of an expert regulatory body and consequently a remedy that could serve as the administrative body's sole enforcement machinery in this area.

The contention that Section 312(b)'s enforcement techniques are restricted in applicability to those parties particularly subject to the general regulatory provisions of Title III also runs contrary to the reasoning of recent decisions emphasizing the flexibility which an expert regulatory agency must possess if it is to keep pace with a still burgeoning industry. We noted in Buckeye Cablevision, Inc. v. FCC, 128 U.S. App.D.C. 262, 267 n. 19, 387 F.2d 220, 225 n. 19 (1967), that we were not disposed to the suggestion that "the Commission's powers are rigidly compart-

---

chapter, or section 1304, 1343, or 1464 of Title 18, or (3) has violated or failed to observe any rule or regulation of the Commission authorized by this chapter or by a treaty ratified by the United States, the Commission may order such person to cease and desist from such action.

27. As previously noted, the Commission stayed portions of its Order as respects certain carriers. See note 15, *supra*.

28. Section 214(c), 47 U.S.C. § 214(c) (1962), provides:
    (c) The Commission shall have power to issue such certificate as applied for, or to refuse to issue it, or to issue it for a portion or portions of a line, or extension thereof, or discontinuance, reduction, or impairment of service, described in the application, or for the partial exercise only of such right or

privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. After issuance of such certificate, and not before, the carrier may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, extension, acquisition, operation, or discontinuance, reduction, or impairment of service covered thereby. Any construction, extension, acquisition, operation, discontinuance, reduction, or impairment of service contrary to the provisions of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, the State commission, any State affected, or any party in interest.

mentalized into 'licensing' and 'public utility regulation' functions." In *Buckeye*, this court upheld a cease and desist order which the Commission had issued against a CATV operator, a member of a class which the Commission,[29] this court,[30] and the Supreme Court[31] have recognized as not readily encompassed within the clear language of either Title II or Title III. The interest there respected was one of preserving the Commission's capacity to respond to changes which necessarily emanate from a dynamic industry. *See Southwestern, supra*; Valley Vision, Inc. v. FCC, 399 F.2d 511 (9th Cir. 1968). Were the language of Section 312(b) not so dispositive of the propriety of the Commission's action, this consideration itself might well be.

Our review satisfies us that the Decision and Order of the Commission should be

Affirmed.

---

29. Frontier Broadcasting Co. v. Collier, 24 F.C.C. 251 (1958).

30. Philadelphia Television Broadcasting Co. v. FCC, 123 U.S.App.D.C. 298, 359 F.2d 282 (1966).

31. United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968).