CALIFORNIA INTERSTATE TELEPHONE COMPANY, Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee,

Western Union Telegraph Company, Intervenor.

No. 17920.

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 9, 1964.

Decided Feb. 6, 1964.

557

Mr. Donald C. Beelar, Washington, D. C., and Mr. James H. Krieger, Riverside, Cal., of the bar of the Supreme Court of California, pro hac vice, by special leave of court, for appellant. Mr. Donald L. Gunnels, Washington, D. C., also entered an appearance for appellant.

Mr. Joel H. Levy, Counsel, F. C. C., with whom Messrs. Max D. Paglin, Gen. Counsel, Daniel R. Ohlbaum, Associate Gen. Counsel, and Mrs. Ruth V. Reel, Counsel, F. C. C., were on the brief, for appellee. Mr. Herman I. Branse, Counsel, F. C. C., also entered an appearance for appellee.

Mr. Melvin Richter, Washington, D. C., with whom Messrs. George T. Vogel,

New York City, and Jack Werner, Washington, D. C., were on the brief, for intervenor.

Before WILBUR K. MILLER, BASTIAN and WRIGHT, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

Under contract with the National Aeronautics and Space Administration, Jet Propulsion Laboratories (a division of California Institute of Technology) operates the Administration's Deep Space Instrumentation Facility in an area owned by the Federal Government called Goldstone, in California, north of Barstow. The Goldstone facility is a ground station which receives data from and transmits commands to unmanned spacecraft. Data received from spacecraft are "bounced through" Goldstone to a facility of the unmanned deep space exploration program at Pasadena, operated by Jet Propulsion, for computer analysis. Pasadena's commands, based on that analysis, are "bounced through" Goldstone to the spacecraft. Obviously, Jet Propulsion is an important part of the Government's program for exploration of space; it is equally obvious that the best possible means of communication between Pasadena and spacecraft must be employed.

To that end, Jet Propulsion Laboratories called a bidders' conference for December 12, 1961, to inform the invited common carriers and private microwave manufacturers of its design requirements for a microwave communication system for the transmission of spacecraft scientific data, commercial video data, and voice and teletype data. Jet Propulsion specified for the system a reliability of 99.5 per cent.[1]

In January, 1962, bids were submitted to Jet Propulsion by several equipment manufacturers, by Western Union Telegraph Company, and by Pacific Telephone and Telegraph Company in connection with California Interstate Telephone Company. Western Union proposed a reliability of 99.9 per cent.[2] The bids were evaluated by a team of four Jet Propulsion technical representatives who unanimously selected Western Union as the best bidder, largely because of the greater reliability proposed by it. On May 16, 1962, Jet Propulsion issued to Western Union a service order which incorporated into its earlier specifications the higher reliability which Western Union had proposed.

In order to obtain regulatory authority to render the service which had been offered to and accepted by Jet Propulsion, Western Union filed with the Federal Communications Commission on August 13, 1962, six applications for permits to construct facilities needed for a "5-hop" microwave circuit between Goldstone and Pasadena. On September 20, California Interstate filed with the Commission applications for construction permits for facilities necessary to meet Jet Propulsion requirements (except for the higher reliability feature), and asked that Western Union be ordered to construct and operate interconnecting facilities at Sierra Peak and Pasadena. California Interstate also asked the Commission to deny four of Western Union's applications be-

1. The term "reliability" as used in the radio microwave trade is a measure of the aggregate "outage" from service, or cessation of operability, over the period of one year's continuous operation.

2. At first blush, this may seem to be an insignificant increase in the 99.5 per cent reliability originally specified by Jet Propulsion. But the difference in outage which results is of very real significance. A calculation of the two reliability proposals is helpful: There are 8,760 hours in a year. A 99.5 per cent reliability would be equivalent to an outage aggre-gating 43.8 hours per year. A 99.9 per cent reliability would be equivalent to an aggregate outage of 8.7 hours per year. Outages could be in duration from fractions of a second, seconds, minutes and hours, regardless of the cause of the outage, e. g., propagation, maintenance, power failures, equipment failures, etc. The elimination of 35.1 hours of outage in a year might eliminate the possibility of the failure of tremendously expensive and important experiments, and was considered by Jet Propulsion's experts as decisive.

cause its proposed construction would invade the area served by it, and therefore would be contrary to public policy.

California Interstate also opposed Western Union at the state level: on October 23, 1962, it petitioned the California Public Utilities Commission to enjoin Western Union from constructing or operating the Jet Propulsion service, claiming that it would be in intrastate commerce and would invade California Interstate's operating territory. The State Commission decided on October 1, 1963, that the proposed service was primarily in interstate or foreign commerce, with only incidental intrastate phases, and that it had no jurisdiction.

As Western Union and California Interstate presented competing applications for the service desired by Jet Propulsion, the Federal Communications Commission conducted a comparative hearing, after which it granted the applications of Western Union and denied those of California Interstate in an opinion released May 29 and corrected June 3, 1963. It found *inter alia*, after describing the competing proposals in detail, that "Western Union has proposed the system required to meet the JPL-Western Union reliability specification and is entitled to a clear preference over CITCO [California Interstate] on the crucial factor of reliability." The latter appeals, as permitted by Section 402(b) of the Federal Communications Act, 47 U.S.C. § 402(b).

California Interstate relies for reversal upon four points which it states as follows:

"1. In view of the division of regulatory authority over common carriers and common carrier services between state commissions and the FCC, the Commission's decision is invalid by reason of its failure to determine the basic jurisdictional issue, whether the proposed microwave facility or service would be under common carrier regulation of the State of California or under federal regulation.

"2. The Commission erred in granting Western Union's applications without determining whether Western Union was legally qualified under California law or under Title II of the Communications Act and FCC Regulations, Part 63, to furnish the needed common carrier service at Goldstone.

"3. The Commission failed to make findings on the specified hearing issues in this proceeding and wholly failed to consider issues of decisional significance. The Commission summarily disregarded significant features comparing the merits of the two proposals and the advantages or disadvantages which either would bring to the public, and, instead, based its decision on the assumption that the urgent need for service justified a preference for Western Union on the factor of extra predicted circuit reliability.

"4. The Commission's decision erroneously authorized Western Union to duplicate CITCO's facilities and services at Goldstone without considering or passing upon classical economic principles governing common carrier regulation in the public interest."

We shall discuss these points in the above order.

1. As California Interstate did not challenge the Federal Communications Commission's jurisdiction in the proceeding before that body, it cannot do so here. Judicial review of administrative action is limited to matters upon which the agency has had an opportunity to pass. Albertson v. Federal Communications Comm., 100 U.S.App.D.C. 103, 243 F.2d 209 (1957). Even if that were not so, we think that in the circumstances the Commission was not required, before it acted, to make an express finding that the proposed microwave facility would be in interstate or foreign commerce and therefore subject to its jurisdiction. Its assumption and exercise of jurisdiction were amply jus-

tified because the physical facts clearly showed the system would be in foreign commerce as defined by the statute.[3]

It is true that the only earth stations involved in this system are at Goldstone and Pasadena, both in California. The record shows, however, that the purpose of the system is to provide communication between spacecraft and Pasadena, the "bouncing through" Goldstone being practically instantaneous. Voice communications between Goldstone and Pasadena will be subordinate to data, and will be used primarily to coordinate the system and to check on its operating characteristics. Being merely adjuncts to the transmission of signals between Pasadena and spacecraft, the voice and data transmissions between Pasadena and Goldstone will be, as the California Commission said, "secondary and subsidiary to the primary use of radio communication and data transmission in interstate or foreign commerce."

■ We think, moreover, that the statutory definition of "foreign communication" or "foreign transmission" in Section 3(f) of the Communications Act, 47 U.S.C. § 153(f),[4] requires the conclusion that this proposed system will be used in foreign commerce, and will therefore be subject to the jurisdiction of the Commission.

■ 2. From our conclusion stated above that the new microwave system will be used in foreign commerce and will not be subject to the jurisdiction of the California Commission, it follows that the Federal Communications Commission did not err in failing to determine wheth-er Western Union was legally qualified under California law.

■ The further contention that the Commission erred in granting Western Union's applications when the latter was not certificated under Section 214(a) of the Act, 47 U.S.C. § 214(a),[5] to undertake the construction, must be rejected. California Interstate did not make the point before the Commission. Anyway, whether a certificate under Section 214(a) must be obtained before Western Union can "undertake the construction" authorized by the construction permits is a question we need not decide, even if it were presented; for the acquisition of a certificate under Section 214(a) is not a condition precedent to the issuance of a construction permit. If it were necessary to have such a certificate before actually beginning construction—which we seriously doubt—it could be applied for after the issuance of the construction permits.

3. The appellant asserts the Commission failed to make findings on issues of decisional significance, and that some findings which were made are either inconsequential, erroneous or superficial. Specifically, it is claimed that "the Commission erred in failing to make necessary, responsible, and supportable findings" to resolve the "vital issue" of the rates proposed by the applicants.

We agree with the Commission that the rates proposed by the applicants did not constitute such a "vital issue" in the proceeding as to require an investigation and determination of the reasonableness of and justification for the several rates

---

3. See note 4, *infra*.

4. That subsection is as follows:
"(f) 'Foreign communication' or 'foreign transmission' means communication or transmission from or to any place in the United States to or from a foreign country, or between a station in the United States and a mobile station located outside the United States."

5. The pertinent portion of the section is:
"(a) No carrier shall undertake the construction of a new line or of an ex-tension of any line, or shall acquire or operate any line, or extension there-of, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line * * *."

proposed. To be sure, an issue designated by the Commission for hearing was "to determine, on a comparative basis, the facts with respect to the proposed facilities, including the rates, charges * * *." Pursuant to this designation, the Commission found facts from which it concluded that Western Union proposed a monthly charge of $10,234 and that California Interstate's monthly charge would be at least $16,592.86 and might be, under proposed amendments, $20,266.22. We think the Commission was correct in saying only "We have considered the rates of the two applicants and have found that Western Union's quoted rates are lower than those of CITCO's [sic]."

California Interstate insists, however, that Western Union's rates are non-compensatory·and were not supported by any evidence as to actual investment, operating expenses, allocation data, and rate of return. With respect to this the Commission said in its decision:

"* * * We have further considered CITCO's claim that Western Union's rates would be non-compensatory but find no persuasive support in the record for such allegation. *Moreover, the reasonableness of the rates is not in issue.*" (Emphasis supplied.)

We think this was an adequate answer to appellant's assertions, as the designated issue was to determine the facts about the rates proposed by the applicants. The facts were found, the rates were compared, and Western Union's found lower. As the Commission said, this was not a proceeding to determine the reasonableness of the rates.

In this case, as in all cases, the ultimate question to be determined by the Commission, in deciding which of two competing applicants for construction permits should prevail, is which would better serve the public interest. The Commission's choice of one applicant to the exclusion of the other is within its province if it has a rational basis in the record and therefore is not arbitrary and capricious. As we said in the *Pinellas* case,[6] "The controversy is in an area into which the courts are seldom justified in intruding." And in McClatchy Broadcasting Company v. Federal Communications Comm'n,[7] this court said:

"* * * It [the Commission] has the duty, in choosing between competing applicants, to decide which would better serve the public interest. Where that interest lies is always a matter of judgment and must be determined on an *ad hoc* basis. The broad statutory standard of 'public convenience, interest, or necessity' is not susceptible of precise or comprehensive definition. Its meaning cannot be imprisoned in a formula of general application. The responsibility for making the determination is committed to the Commission, subject to the limitations that it must proceed within constitutional and statutory bounds and that it must not act arbitrarily or capriciously. * * *"

This is not the usual case of competing applications for a permit to construct a radio broadcasting station. Rather, it is one where a single customer which requires a highly specialized service to be used in the performance of a contract with the federal space agency invited proposals and selected Western Union as offering the only bid which met its requirement of the utmost reliability. Its team of experts unanimously based its choice upon that factor. Although Western Union had already been chosen by the customer to be served, it was under the necessity of obtaining construction permits from the Commission because the

6. Pinellas Broadcasting Co. v. Federal Communications Comm'n, 97 U.S.App. D.C. 236, 238, 230 F.2d 204, 206, cert. denied 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956).

7. 99 U.S.App.D.C. 195, 198, 239 F.2d 15, 18 (1956), cert. denied Sacramento Telecasters, Inc. v. McClatchy Broadcasting Co., 353 U.S. 918, 77 S.Ct. 662, 1 L.Ed.2d 665 (1957).

desired system involved the construction and operation of radio facilities. California Interstate had not submitted its own proposal to Jet Propulsion, but had joined in that of Pacific Telephone and Telegraph which did not meet Jet Propulsion's specifications as to reliability and was rejected by it principally for that reason. Nevertheless, California Interstate filed its applications in competition with those of Western Union, based on the inferior reliability specification which Jet Propulsion had rejected. There is no intimation in the record that Jet Propulsion would be willing to contract with California Interstate if it were certificated.

In the usual case, in deciding which of competing applicants for the construction of radio transmission facilities would best serve the public interest, the Commission must determine what the public interest is, because the public to be served is, as a whole, inarticulate; that is to say, the Commission is not aided by an authoritative statement from the public as to what it wants and needs. But in this unusual case, the interested public—Jet Propulsion—was articulate about its needs, and said in advance that Western Union's is the only proposal which meets its requirements. In this area, Jet Propulsion is probably more expert than is the expert Commission; certainly, the basis of its choice was entitled to be given great weight by the Commission. And, as said before, Jet Propulsion's decision was that reliability is the most important and, therefore, the determining factor. We think the Commission correctly used the word "crucial" in the following sentence:

"Western Union has proposed the system required to meet the JPL–Western Union reliability specification and is entitled to a clear preference over CITCO in the crucial factor of reliability. * * *"

4. California Interstate's contention that the Commission erroneously authorized its facilities and services at Goldstone to be duplicated by Western Union appears to be an ungrounded apprehension. The contention was adequately answered by the Commission in this paragraph of its conclusions:

"The instant case is unique in that in addition to the critical time element, the need for urgency and the fact that the applicants herein are vying to fill JPL's stated need for a highly reliable 'real time' circuit directly relaying satellite signals, the situation presented is not the usual one of a telephone utility attempting to institute service in the territory served by another telephone utility. What is present here is competition by a telegraph company and a telephone company to furnish a broad-band carrier service utilizing microwave links, a service in neither the usual telephone or telegraph category. Because of this we believe that the arguments made by CITCO and USITA regarding territorial exclusivity and the Commission's power to order, or the desirability of, interconnection are not applicable or sound. We do note, however, in connection with CITCO's expressed fear that Western Union's surplus facilities will be used to take existing and potential customers of CITCO, that JPL indicates that the proposed facilities are not to be used for administrative communications or for local exchange or telephone service. Moreover, the possibilities are remote that these identical facilities of the JPL system can be used for other customers without new facilities or the extension of existing facilities, and the Commission has jurisdiction under Section 214 of the Communications Act (47 USC 214) over extensions of common carrier facilities and service."

From all the foregoing, we conclude the Federal Communications Commission did not err in granting Western Union's applications and in denying those of California Interstate.

Affirmed.