589 F.2d 647
 191 U.S.App.D.C. 124
 HAWAIIAN TELEPHONE COMPANY, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
RCA American Communications, Inc., Intervenor.
GTE SATELLITE CORPORATION, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
American Satellite Corporation, Intervenor.
GTE SATELLITE CORPORATION, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee.
GTE SATELLITE CORPORATION, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Western Union International, Inc. and American Satellite
Corporation, Intervenors.
HAWAIIAN TELEPHONE COMPANY, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
American Satellite Corporation, Intervenor.
HAWAIIAN TELEPHONE COMPANY, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
American Satellite Corporation and Western Union
International, Inc., Intervenors.
HAWAIIAN TELEPHONE COMPANY, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
GTE Satellite Corporation and RCA American Communications,
Inc., Intervenors.
GTE SATELLITE CORPORATION, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
RCA American Communications, Inc., Intervenor.
 Nos. 77-1533, 77-1544, 77-1722, 77-1723, 77-1555, 77-1556,
77-1557, 77-1658, 77-1659, 77-1660 and 77-1721.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 25, 1978.
Decided Nov. 13, 1978.
As Amended Nov. 15 and Dec. 19, 1978.
 
 Thomas J. O'Reilly, Washington, D. C., and Vincent Gallogly, Stamford, Conn., for appellants. A. R. Frischkorn, Jr., Washington, D. C., also entered an appearance for appellant in Nos. 77-1554, 77-1555, 77-1556, 77-1721, 77-1722, and 77-1723, and for intervenor GTE Satellite Corporation in No. 77-1660. Vincent Gallogly, Stamford, Conn., also entered an appearance for intervenor GTE Satellite Corporation in No. 77-1660.
 Gregory M. Christopher, Counsel, Federal Communications Commission, Washington, D. C., with whom Daniel M. Armstrong, Associate Gen. Counsel, Federal Communications Commission, and Peter Delacruz, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee. Werner K. Hartenberger and Jack David Smith, Counsel, Federal Communications Commission, Washington, D. C., also entered appearances for appellee.
 Jay E. Ricks, Washington, D. C., with whom Carl J. Cangelosi, Piscataway, N. J., and Gardner F. Gillespie, Washington, D. C., were on the brief, for intervenor RCA American Communications, Inc. in Nos. 77-1533, 77-1660, and 77-1721; also presented argument on behalf of all other intervenors.
 Michael D. Campbell, Stuart G. Meister, and Peggy Crespi Kaplan, Germantown, Md., were on the brief for intervenor American Satellite Corporation in Nos. 77-1554, 77-1556, 77-1557, 77-1658, 77-1659, 77-1722, and 77-1723.
 John M. Gibbons and Michael H. Mobbs, Washington, D. C., and Alvin K. Hellerstein, New York City, were on the brief for intervenor Western Union International Inc. in Nos. 77-1556, 77-1659, and 77-1722. Robert E. Conn, New York City, also entered an appearance for intervenor Western Union International, Inc. in Nos. 77-1556, 77-1659, and 77-1722.
 Rosel H. Hyde, Herbert E. Marks, and Laurel R. Bergold, Washington, D. C., were on the brief for Amicus curiae State of Hawaii, urging affirmance.
 Before WRIGHT, Chief Judge, and TAMM and ROBB, Circuit Judges.
 Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.
 J. SKELLY WRIGHT, Chief Judge:
 
 
 1
 This case involves eleven consolidated appeals in which appellants Hawaiian Telephone Company (HTC) and GTE Satellite Corporation (GSAT) seek review of three sets of orders of the Federal Communications Commission (FCC) that authorized construction and operation of satellite earth stations (and in one case a terrestrial microwave link) to transmit communications between the Mainland and Hawaii.[1] The authorizations were granted upon application of American Satellite Corporation (ASC), Western Union International, Inc. (WUI), and RCA American Communications, Inc. (RCA Americom), all of whom are intervenors in the present proceedings. The FCC granted the authorizations pursuant to the relevant provisions of the Communications Act of 1934, 47 U.S.C. §§ 214, 308, 309, & 319 (1970 & Supp. V 1975), which require, Inter alia, that the FCC ensure that the "public convenience and necessity" be served by any such authorizations.[2]
 
 
 2
 In each of the three cases the applicant RCA Americom, WUI, or ASC sought authorization from the FCC so that it could comply with the terms of a contract for provision of private line communications services that it had recently been awarded by a government agency. RCA Americom had been awarded such a contract by the National Air and Space Administration; ASC by the Advanced Research Projects Agency; and WUI by the Defense Commercial Communications Office. The latter two agencies are within the Department of Defense. Appellants HTC and GSAT argue that, in authorizing construction and operation of the earth stations, the FCC relied excessively on the awarding of the contracts by the government agencies, which resulted in the Commission's abdication to those agencies of its role in determining "public convenience and necessity." Appellants argue further that the FCC's decisions in these cases depart from its previously announced policy with respect to satellite communications between the Mainland and Hawaii.[3] The FCC's orders, they conclude, are infirm and should be reversed by this court.[4]
 
 
 3
 The FCC responds that it complied with its proper institutional role in applying the "public convenience and necessity" standard mandated by Section 214 and did not place undue emphasis on the contracts awarded by the three government agencies. Additionally, the Commission contends that its policy with respect to satellite communications to Hawaii is sufficiently flexible to accommodate the orders in the present proceedings. We agree with the FCC on both counts and accordingly affirm the three sets of Commission orders challenged in this case.
 
 I. BACKGROUND
 A. The ASC Applications
 
 4
 The Advanced Research Projects Agency (ARPA), an agency of the Department of Defense engaged in a variety of research projects involving national defense and security, awarded a contract to ASC to provide communications between the Mainland and Hawaii. The agency needed the additional communications capacity in connection with "planned activity in the Pacific Ocean Region which involves coordination of various (Department of Defense) participants in that area." Joint Appendix (JA) 69. ASC was awarded this communications contract on a "sole source" basis, which means that, in the opinion of ARPA, ASC was the only carrier qualified to meet the technical and temporal demands of the project. In particular, ASC, at the time it was awarded the present contract, was party to another contract with ARPA to provide "communications facilities and service for a domestic acoustic research data network," JA 68, and the new contract was intended merely to expand this network by addition of the Hawaiian link. This preexisting arrangement meant both that ASC was equipped technologically to handle the communications needs of ARPA and that, because of the existing communications network and ASC's proven technological competence, ASC could most expeditiously provide the additional communications service required by ARPA.
 
 
 5
 To provide the expanded service, however, ASC had to construct and operate an earth station at Barbers Point Naval Air Station, Hawaii, to supplement the two earth stations it already operated for ARPA. The expanded service and new earth station required that ASC apply for authorization from the FCC.[5] Appellants HTC and GSAT, along with ITT World Communications, Inc. and AT&T Long Lines, filed petitions to deny the application essentially on grounds that their existing Hawaiian facilities were up to the task of providing the needed service, that an FCC grant of authority would depart from the Commission's past policy of "rate integration"[6] toward Hawaii, and that ASC had not projected sufficient revenues to justify the investment. JA 177-189.
 
 
 6
 ARPA had originally scheduled commencement of the new communications service on June 1, 1977, but as late as early April the FCC had yet to act upon the ASC application, which had been filed the previous February. As a result, ASC wrote the FCC on April 7 requesting a waiver of the construction permit requirement so that it could commence construction of the earth station in time to meet the June 1 deadline. JA 225. "In view of the urgency and critical nature of ARPA's needs," JA 9, the waiver was granted by the Chief of the FCC's Common Carrier Bureau pursuant to 47 U.S.C. § 319(d) (1970). But the waiver made it clear that ASC undertook the preliminary construction at its own risk, for it might still be the case that the underlying application to operate the earth station would be rejected by the FCC. Appellant GSAT, asserting that the Chief of the Common Carrier Bureau had acted outside the scope of his delegated authority, applied for review of the waiver, but the Commission denied GSAT's application.
 
 
 7
 On June 7, 1977, with ASC's original application still not acted upon, the Office of the Secretary of Defense corresponded with the Commission to the effect that two major military exercises in the Pacific, named "Church Stroke" and "Panoic," would have their scientific and data-gathering objectives compromised if the Barbers Point earth station were not providing service by June 10. The FCC found "that the public interest will be served by a grant of temporary authority to operate this circuit until the Commission has an opportunity to act on the underlying applications," JA 23, and granted temporary authority not to exceed 90 days. Within that 90-day period the FCC, in a "Memorandum Opinion, Order, Authorization and Certificate" adopted on July 13, 1977 and released on July 22, 1977, approved ASC's application to construct and operate the line of communications, including the earth station at Barbers Point.[7]
 
 B. The RCA Americom Applications
 
 8
 The National Air and Space Administration (NASA) awarded a contract to RCA Americom, pursuant to competitive bidding, to provide a channel of high-speed data communications between NASA's Hawaiian Satellite tracking station and its Goddard Space Center installation in Greenbelt, Maryland. To fulfill its requirements under the contract, RCA Americom sought from the FCC authority to construct and operate the channel of communications, as well as a satellite earth station at Barking Sands, Kauai, Hawaii, and a terrestrial microwave link between Barking Sands and Kokee Park, Kauai, Hawaii.[8] RCA Americom had previously constructed the earth station at the Greenbelt, Maryland terminal of the proposed communications system.
 
 
 9
 Petitions to deny were filed by HTC and Western Union Telegraph Company,[9] largely on grounds identical to those relied on in the ASC case: existing facilities could handle the communications, an FCC decision favoring RCA Americom would be contrary to settled Commission policy, and insufficient revenues had been projected. JA 318-331; See also JA 354-358 (containing parallel objections of GSAT expressed in correspondence to FCC). The similarity between this case and the ASC case does not end here. In March 1977 NASA sent a telegram to RCA Americom, which RCA Americom dutifully passed on to the FCC, stating that the "High Energy Astronomy Observatory Project," scheduled for an April 15 launching, "urgently required" the communications service to be provided by RCA Americom pursuant to its contract. JA 387. Upon application, the Chief of the FCC's Common Carrier Bureau granted a waiver here as well, JA 1, and, like the waiver in the ASC case, this one was expressly conditioned on the understanding that any construction undertaken on the earth station would be at the applicant's own risk, because the underlying application to operate the earth station could still be denied. Appellant GSAT again applied for review of this waiver, but the FCC found that the Chief of the Common Carrier Bureau had acted within his zone of discretion. JA 16. Shortly thereafter, RCA Americom asked for temporary authority to operate the circuit, and such authority was granted on June 9, 1977, not to extend beyond July 20. Finally, in a "Memorandum Opinion, Order, Authorization and Certificate" adopted on July 13 and released on July 21, the Commission approved RCA's underlying application to construct and operate the proposed line of communications, including the earth station at Barking Sands and the terrestrial microwave link between Barking Sands and Kokee Park.[10]
 
 C. The WUI/ASC Applications
 
 10
 The Defense Commercial Communications Office (DECCO), like ARPA an agency of the Department of Defense, awarded a contract, pursuant to competitive bidding, to WUI to provide high-speed communications between Stockton, California and Wahiawa, Hawaii. WUI planned to meet its contractual obligations by constructing and operating a satellite earth station at the Naval Communications Station at Wahiawa and by leasing capacity in an earth station to be constructed by ASC in Stockton. In this proceeding both ASC and WUI sought authorization from the FCC to construct and operate their respective lines of communications and earth stations.[11] Again, appellants HTC and GSAT filed petitions to deny, along with RCA Global Communications, Inc., ITT World Communications, Inc., and RCA Americom, arguing that anticipated revenue from the project was not sufficient to justify the investment, existing facilities were adequate, and the policy of rate integration would be jeopardized. JA 588-659.
 
 
 11
 When awarding the contract to WUI, DECCO stipulated a service date of May 31, 1977. Prior to that date WUI and ASC requested that the FCC grant a waiver so that preliminary construction could be commenced on the earth stations. Citing an "urgent and critical need," JA 4, as evidenced by certain communications of the Department of Defense, the Chief of the Common Carrier Bureau granted the waiver subject to the same conditions adopted in the ASC and RCA Americom cases. GSAT sought to have the waiver reviewed, but its application was denied by the FCC on grounds that the Chief of the Common Carrier Bureau had acted properly in granting the waiver. JA 13. In a "Memorandum Opinion, Order, Authorization and Certificate" adopted on July 13 and released on July 22, the FCC approved the applications of WUI and ASC to construct and operate their respective earth stations and lines of communications.[12]
 
 II. ISSUES ON APPEAL
 
 12
 Appellants rely primarily on two closely related contentions in challenging the FCC's orders in the proceedings below. First, appellants maintain that the FCC's decisions depart from settled policy toward satellite communications between Hawaii and the Mainland. Second, appellants argue that, in applying the "public convenience and necessity" standard of Section 214, the Commission placed undue reliance on the needs of NASA, ARPA, and DECCO as stated and as evidenced by their awarding of contracts to RCA Americom, ASC, and WUI, respectively. By so relying, it is contended, the FCC ignored the public nature of the standard to be applied.
 
 
 13
 An understanding of the FCC's policy with respect to satellite communications to Hawaii is important to evaluation of both contentions.[13]A. The FCC and Satellite Communications to Hawaii
 
 
 14
 Over a decade ago the FCC initiated rulemaking proceedings to formulate a policy for the domestic satellite field. As publicly announced, See Notice of Inquiry, 31 Fed.Reg. 3507 (March 2, 1966); Supplemental Notice of Inquiry, 31 Fed.Reg. 13763 (Oct. 20, 1966), the inquiry was to focus on legal, policy, and technical questions that would arise as communications services began to be provided by means of domestic satellite facilities. In In the Matter of Establishment of Domestic Communication-Satellite Facilities by Non-governmental Entities, 22 FCC2d 86 (1970) (the First Report and Order ), the Commission was unable to determine "whether domestic communications satellite opportunities would be more fully and effectively developed through one or more multipurpose systems, specialized systems, through a combination of both, or through an essentially 'open entry' policy." Id. at 93. Nevertheless, the FCC did recognize that
 
 
 15
 (t)he most important value of domestic satellites at the present time appears to lie in their potential for opening new communications markets, for expanding the beneficial role of competition in the existing markets for specialized communications services, and for developing new and differentiated services that reflect the special characteristics of the satellite technology. Realization of this potential will require innovative technological and service planning and development. * * *
 
 
 16
 Id. at 95-96. In In the Matter of Establishment of Domestic Communications-Satellite Facilities by Non-governmental Entities, 35 FCC2d 844 (1972) (the Second Report and Order ), however, the Commission was less tentative. The FCC, Id. at 846, chose to be "guided by the following objectives in formulating the policies to govern our licensing and regulation of the construction and use of satellite systems for domestic communications purposes":
 
 
 17
 (a) to maximize the opportunities for the early acquisition of technical, operational, and marketing data and experience in the use of this technology as a new communications resource for all types of services;
 
 
 18
 (b) to afford a reasonable opportunity for multiple entities to demonstrate how any operational and economic characteristics peculiar to the satellite technology can be used to provide existing and new specialized services more economically and efficiently than can be done by terrestrial facilities;
 
 
 19
 (c) to facilitate the efficient development of this new resource by removing or neutralizing existing institutional restraints or inhibitions; and
 
 
 20
 (d) to retain leeway and flexibility in our policy making with respect to the use of satellite technology for domestic communications so as to make such adjustments therein as future experience and circumstances may dictate.
 
 
 21
 Id. at 846-847. This policy of "multiple entry" was thought "most likely to produce a fruitful demonstration of the extent to which the satellite technology may be used to provide existing and new specialized services more economically and efficiently than can be done by terrestrial facilities." Id. at 847. It is of no small importance that, in announcing this policy, the FCC recognized the dynamic nature of the setting in which it was operating. Thus the Commission sought explicitly to retain "leeway and flexibility" for its future domestic satellite policymaking. Id.
 
 
 22
 The FCC's Second Report and Order went on to treat specially the circumstance of Alaska, Puerto Rico, and Hawaii, Id. at 856-859, only the last of which, of course, is relevant to the present inquiry. The Commission concluded that the goal of placing Hawaiian communications and charges on an equal footing with those of the contiguous 48 states was of fundamental importance hence the policy of "rate integration." Id. Crucial to realization of this goal was satellite technology, for a salient characteristic of such technology is its distance insensitivity. To give impetus to the movement toward rate integration, the FCC required appellants in the present proceeding to "reserve adequate transponder and earth station capacity for lease to other carriers authorized to provide specialized services to these points in such manner as will not necessitate another earth station antenna * * *." Id. at 858. But this requirement was immediately leavened by the following observation:
 
 
 23
 We do not preclude the offering of specialized services to such points by means of independent domestic satellite facilities authorized to other licensees, so long as the public in Alaska, Hawaii and Puerto Rico has the opportunity to take advantage of the potential cost savings in obtaining specialized services on the same satellite system facilities used for (message toll telephone services).
 
 
 24
 Id. The Commission reconsidered its Second Report and Order in In the Matter of Establishment of Domestic Communications-Satellite Facilities by Non-governmental Entities, 38 FCC2d 665 (1972). The FCC reaffirmed both its general policy favoring multiple entry and its special concern for the rate integration issue with respect to Hawaii, Alaska, and Puerto Rico. On the latter point the Commission wrote that "we will consider on their merits applications from * * * any * * * eligible applicant desiring to provide specialized interstate and/or intrastate services to (Hawaii, Alaska, and Puerto Rico) by means of independent satellite system facilities owned by such applicants." Id. at 696. Such applicants would, however, "be required to show with specificity how a grant of their application will serve the public interest and how they will provide tangible benefits in the form of new and better service, lower rates, etc." Id.
 
 
 25
 B. The FCC's Policy Applied in the Present Proceedings
 
 
 26
 Appellants argue here that these various Commission pronouncements, viewed as a whole, represent a settled FCC policy which, properly applied, would have mandated a denial by the FCC of the applications of the three intervenors. We agree that the FCC has taken some pains to construct a policy foundation on which to build when deciding future questions respecting domestic satellite communications between the Mainland and Hawaii. But we do not believe that this foundation is so narrow that it cannot support the Commission's decisions before us.
 
 
 27
 The FCC's policy can be summarized as follows: access to the domestic communications satellite field is governed by the concept of multiple entry, under which "qualified applicants (are to be afforded) a reasonable opportunity to demonstrate the public advantages in use of the satellite technology," 35 FCC2d at 850; See 38 FCC2d at 696, but where Hawaii is concerned the Commission must take care, in passing on applications of potential entrants to the domestic communications satellite field, not to interfere with progress toward the goal of rate integration. The dual character of this policy multiple entry combined with the goal of Hawaiian rate integration gives content to the statutory "public convenience and necessity" standard as it relates to domestic satellite communications between the Mainland and Hawaii.
 
 
 28
 Inspection of the FCC's orders before us reveals a sensitivity to this bipartite policy, and hence to the public convenience and necessity standard, on the part of the Commission. First, in all three orders the FCC directly confronted the rate integration issue and found, upon consideration, that no Prima facie showing had been made that diverting business from appellants' existing facilities by granting the applications would have a substantial adverse impact on the integration of rates.[14] The Commission, after noting the satisfactory progress made toward the goal of rate integration, reasoned that
 
 
 29
 our rate integration objectives for Hawaii-Mainland service were not premised on the requirement that all Hawaiian satellite traffic be routed through a single earth station in Hawaii. Nor is the maximization of domestic satellite traffic through the Sunset, Hawaii MTS (message toll telephone service) earth station (operated by appellant GSAT) the Sine qua non of achieving this objective * * *. Arguments that specialized earth stations in Hawaii for private line services might inhibit the growth of the traffic base of the earth station used for MTS, leading to an increase in costs of services provided through this latter earth station are purely speculative. They are not sufficient to outweigh the demonstrated benefits to the customer and the public from such specialized facilities.
 
 
 30
 In the Matter of the Application of RCA American Communications, Inc., 65 FCC2d 354, 358-359 (1977). See also In the Matter of the Application of American Satellite Corp., 65 FCC2d 267, 273 (1977); In the Matter of the Applications of American Satellite Corp. and Western Union International, Inc., 65 FCC2d 279, 290 (1977).
 
 
 31
 Second, the FCC reviewed and found persuasive the considerations of national security and cost effectiveness that had led the customer government agencies to grant contracts to RCA Americom, ASC, and WUI. The FCC thus identified the tangible public benefits from competition achieved in this case through application of its policy of multiple entry.[15] 38 FCC2d at 696. See FCC v. RCA Communications, Inc., 346 U.S. 86, 96-97, 73 S.Ct. 998 (1953) ("some beneficial effect" from competition); California Interstate Telephone Co. v. FCC, 117 U.S.App.D.C. 255, 261, 328 F.2d 556, 562 (1964) (approving FCC's reliance on customer agency's needs in determining public interest); Cf. Washington Utilities & Transp. Comm'n v. FCC, 513 F.2d 1142, 1155-1160 (9th Cir.), Cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975) (public interest standard defined in context of multiple entry policy in the specialized common carrier field).
 
 
 32
 We must not lose sight of the nature of the process that led to the awarding of the contracts. RCA Americom and WUI were awarded their contracts by NASA and DECCO, respectively, as a result of standard competitive bidding practices of the United States Government in which appellant HTC unsuccessfully participated.[16] Such a process presumably allowed the government agencies ample opportunity to compare the bids in terms of cost, security, and overall competence. RCA Americom, for example, had already constructed the earth station at NASA's Greenbelt site that would serve as one terminal in the proposed communications system. Further, the proposed earth station was to be located so that the circuit configuration presented by RCA Americom involved fewer terrestrial links, and hence more security, than other configurations. Similarly, DECCO decided, for reasons of security, that it required an on-site earth station, rather than a terrestrial link to an existing station. Thus even appellants, who operate existing facilities, would have found it necessary, as did WUI, to construct a new earth station, which tends to undermine appellants' arguments here. ASC was awarded its contract by ARPA on a "sole source" basis rather than by virtue of competitive bidding because ASC operated an existing communications system, including two other earth stations, for ARPA, and the new earth station represented merely an expansion of this network.
 
 
 33
 There is no question that the Commission's position before this court would have been indefensible had it ignored rate integration by blindly rubberstamping the contract awards of ARPA, NASA, and DECCO. But here we are reviewing reasoned orders one aspect of which is a willingness on the part of the FCC to assess the adequacy of both existing and proposed facilities with an eye to the specialized needs of the government agencies that, after all, were the source of the present controversy. See California Interstate Telephone Co. v. FCC, supra, 117 U.S.App.D.C. at 261, 328 F.2d at 562.
 
 
 34
 The FCC's reliance on the awarding of these contracts was neither unwarranted nor out of proportion. When coupled with its determination that the goal of rate integration would not be jeopardized by the new facilities, the FCC's assessment of security and cost effectiveness largely in terms of customer needs was justified. Unlike the Commission's action in Hawaiian Telephone Co. v. FCC, 162 U.S.App.D.C. 229, 498 F.2d 771 (1974), where the FCC "merely assert(ed) the benefits of competition in an abstract, sterile way," 162 U.S.App.D.C. at 234, 498 F.2d at 776, the Commission here established concretely the "beneficial effect" of competition as required by the Supreme Court in FCC v. RCA Communications, Inc., supra, 346 U.S. at 96-97, 73 S.Ct. 998.
 
 Accordingly, the orders on review here are
 
 35
 Affirmed.
 
 
 
 [1]
 These consolidated appeals are taken from the following orders of the FCC:
 (1) Memorandum Opinion, Order, Authorization and Certificate, released July 21, 1977 (FCC 77-490), In the Matter of the Application of RCA American Communications, Inc., published at 65 FCC2d 354 (1977);
 (2) Memorandum Opinion, Order, Authorization and Certification, released July 22, 1977 (FCC 77-486), In the Matter of the Applications of American Satellite Corporation and Western Union International, Inc., published at 65 FCC2d 279 (1977);
 (3) Memorandum Opinion, Order, Authorization and Certificate, released July 22, 1977 (FCC 77-485), In the Matter of Application of American Satellite Corporation, published at 65 FCC2d 267 (1977);
 (4) Memorandum Opinion and Order, released June 8, 1977 (FCC 77-382), In the Matter of American Satellite Corporation, published at 67 FCC2d 127 (1977);
 (5) Memorandum Opinion and Order, released May 24, 1977 (FCC 77-336), In the Matter of RCA American Communications, Inc., published at 65 FCC2d 351 (1977);
 (6) Memorandum Opinion and Order, released May 24, 1977 (FCC 77-335), In the Matter of American Satellite Corporation and Western Union International, Inc., reprinted at Joint Appendix (JA) 13-15;
 (7) Letter order Re RCA American Communications, Inc., dated June 9, 1977, Reprinted at JA 22; and
 (8) Letter order Re American Satellite Corporation, dated June 10, 1977, Reprinted at JA 23.
 One set of orders, including 1, 5, and 7 above, was in response to applications by RCA American Communications, Inc. Another, including 3, 4, and 8 above, was in response to applications by American Satellite Corporation. The final set, including 2 and 6 above, was in response to applications by Western Union International, Inc. and American Satellite Corporation.
 
 
 [2]
 Under 47 U.S.C. § 214 (1970 & Supp. V 1975), the FCC must grant a certificate establishing that the "present or future public convenience and necessity" require construction and operation of a new or extended line of communications:
 S 214. Extension of lines; certificate of public convenience and necessity; discontinuance of service.
 (a) No carrier shall undertake the construction of a new line or of an extension of any line, or shall acquire or operate any line, or extension thereof, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line: Provided, That no such certificate shall be required under this section for the construction, acquisition, or operation of (1) a line within a single State unless such line constitutes part of an interstate line, (2) local, branch, or terminal lines not exceeding ten miles in length, or (3) any line acquired under section 221 or 222 of this title: Provided further, That the Commission may, upon appropriate request being made, authorize temporary or emergency service, or the supplementing of existing facilities, without regard to the provisions of this section. No carrier shall discontinue, reduce, or impair service to a community, or part of a community, unless and until there shall first have been obtained from the Commission a certificate that neither the present nor future public convenience and necessity will be adversely affected thereby; except that the Commission may, upon appropriate request being made, authorize temporary or emergency discontinuance, reduction, or impairment of service, or partial discontinuance, reduction, or impairment of service, without regard to the provisions of this section. As used in this section the term "line" means any channel of communication established by the use of appropriate equipment, other than a channel of communication established by the interconnection of two or more existing channels: Provided, however, That nothing in this section shall be construed to require a certificate or other authorization from the Commission for any installation, replacement, or other changes in plant, operation, or equipment, other than new construction, which will not impair the adequacy or quality of service provided.
 (b) Upon receipt of an application for any such certificate, the Commission shall cause notice thereof to be given to, and shall cause a copy of such application to be filed with, the Secretary of Defense, the Secretary of State (with respect to such applications involving service to foreign points), and the Governor of each State in which such line is proposed to be constructed, extended, acquired, or operated, or in which such discontinuance, reduction, or impairment of service is proposed, with the right to those notified to be heard; and the Commission may require such published notice as it shall determine.
 (c) The Commission shall have power to issue such certificate as applied for, or to refuse to issue it, or to issue it for a portion or portions of a line, or extension thereof, or discontinuance, reduction, or impairment of service, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. After issuance of such certificate, and not before, the carrier may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, extension, acquisition, operation, or discontinuance, reduction, or impairment of service covered thereby. Any construction, extension, acquisition, operation, discontinuance, reduction, or impairment of service contrary to the provisions of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, the State commission, any State affected, or any party in interest.
 (d) The Commission may, after full opportunity for hearing, in a proceeding upon complaint or upon its own initiative without complaint, authorize or require by order any carrier, party to such proceeding, to provide itself with adequate facilities for the expeditious and efficient performance of its service as a common carrier and to extend its line or to establish a public office; but no such authorization or order shall be made unless the Commission finds, as to such provision of facilities, as to such establishment of public offices, or as to such extension, that it is reasonably required in the interest of public convenience and necessity, or as to such extension or facilities that the expense involved therein will not impair the ability of the carrier to perform its duty to the public. Any carrier which refuses or neglects to comply with any order of the Commission made in pursuance of this subsection shall forfeit to the United States $100 for each day during which such refusal or neglect continues.
 Applicants seeking to construct and operate earth stations must also obtain authorization pursuant to 47 U.S.C. §§ 308, 309, & 319 (1970). Clearly, however, the pivotal determinations in the cases before us were those made under § 214.
 
 
 [3]
 See Text at notes 11-13 and note 6 Infra
 
 
 [4]
 Appellants make other, less weighty, arguments, which are discussed at note 13 Infra
 
 
 [5]
 See note 2 Supra
 
 
 [6]
 "Rate integration," as used here, is the policy of integrating Hawaiian communications services and charges into the pattern of the contiguous 48 states, so that Hawaiian services and charges will be equal to those of the contiguous 48 states. See In the Matter of Establishment of Domestic Communications-Satellite Facilities by Non-governmental Entities, 35 FCC2d 844, 856-859 (1972). See generally In the Matter of Integration of Rates and Services for the Provision of Communications by authorized Common Carriers between the United States Mainland and the offshore points of Hawaii, Alaska, and Puerto Rico/Virgin Islands, 61 FCC2d 380, 385-387 (1976)
 
 
 [7]
 In the Matter of the Application of American Satellite Corp., 65 FCC2d 354 (1977)
 
 
 [8]
 See note 2 Supra
 
 
 [9]
 Appellant GSAT joined HTC and Western Union Telegraph Company in replying to RCA Americom's response to the petitions to deny
 
 
 [10]
 In the Matter of the Application of RCA American Communications, Inc., 65 FCC2d 354 (1977)
 
 
 [11]
 See note 2 Supra
 
 
 [12]
 In the Matter of the Applications of American Satellite Corp. and Western Union International, Inc., 65 FCC2d 279 (1977)
 
 
 [13]
 Appellants object to the decisions on review here on several grounds in addition to the primary ones treated in text. First, they assert in passing, appellants' reply brief at 13, that a comparative hearing should have been held by the FCC. We note, however, that 47 U.S.C. § 214 (1970 & Supp. V 1975), unlike the parallel provision in the Communications Act dealing with broadcast licenses, 47 U.S.C. § 309 (1970), does not stipulate that "substantial and material question(s) of fact" must occasion such hearings. Rather, § 214 requires only that there be "full opportunity for hearing." 47 U.S.C. § 214(d) (1970). See American Telephone & Telegraph Co. v. FCC, 572 F.2d 17, 22 (2d Cir. 1978) ("full opportunity for hearing" in 47 U.S.C. § 205(a) (1970) held not to require trial-type hearing). Further, even if we were to hold that a comparative hearing requirement is implicit in § 214, such a ruling would be of no consequence in the cases before us, for no "substantial and material question of fact" is presented. See American Telephone & Telegraph Co. v. FCC, 176 U.S.App.D.C. 288, 295-296, 539 F.2d 767, 774-775 (1976); Network Project v. FCC, 167 U.S.App.D.C. 220, 230-231, 511 F.2d 786, 796-797 (1975); Stone v. FCC, 151 U.S.App.D.C. 145, 151-152, 466 F.2d 316, 322-323 (1972). It is, moreover, evident from the record that full participation and notice characterized the proceedings below, and that appellants made no arguments of procedural deficiency before the FCC
 Second, there is some suggestion, See appellants' brief at 16, 28, that the FCC's decisions were tainted by Ex parte communications sent from the customer agencies NASA, ARPA, and DECCO to the FCC. The communications to which we are referred, appellants' brief at 28 n.36, are those sent by the customer agencies to the FCC pointing out the times by which the proposed services would be needed and why they would be needed by those times. These communications went to the issue of waiver, not to the underlying issue of the grants of authority. The substance of these communications, according to the Commission, appellee's brief at 32 n.25, was made known to counsel for appellants. Appellants, moreover, did not raise the issue of Ex parte communications before the FCC when challenging the grants of waiver or when opposing the underlying applications. This fact, combined with the underdeveloped state of the argument in appellants' brief, serves to undercut this objection to the FCC's decisions.
 Third, appellants believe that the grants of waiver by the Chief of the Common Carrier Bureau went beyond that official's delegated authority. Appellants' brief at 29 n.37. We disagree. The waiver applications presented no "novel questions of fact, law or policy which cannot be resolved under outstanding precedents and guidelines." 47 C.F.R. § 0.291(a)(2) (1977).
 Finally, appellants contend that the FCC should have required a more fully developed economic justification from the applicants before approving their applications. Appellants' brief at 43-44. Such a requirement, however, would not comport with the policy of "multiple entry" as espoused by the FCC. See In the Matter of Establishment of Domestic Communications-Satellite Facilities by Non-governmental Entities, 35 FCC2d 844, 849-850 (1972):
 (I)f we adhere too strictly to conventional standards in this unconventional situation, such as requiring a persuasive showing by new entrants that competition is reasonably feasible and that the anticipated market can economically support its proposed facilities, most such new applicants may in effect be denied any opportunity to demonstrate the merits of their proposals at their own risk and without potential dangers to existing services thereby depriving the public of the potential benefits to be derived from diverse approaches by multiple entrants. * * *
 It was sufficient in the cases before us that the FCC determined that the proposed facilities and services would not impact adversely on the FCC's policy of rate integration toward Hawaii.
 
 
 [14]
 See In the Matter of the Application of American Satellite Corp., supra note 7, 65 FCC2d at 273; In the Matter of the Application of RCA American Communications, Inc., supra note 10, 65 FCC2d at 358-359; In the Matter of the Applications of American Satellite Corp. and Western Union International, Inc., supra note 12, 65 FCC2d at 290
 
 
 [15]
 See text at notes 13-14 Supra
 
 
 [16]
 Appellant GSAT apparently chose not to participate in the bidding